Reversed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge SMALKIN joined. Senior Judge HAMILTON wrote a dissenting opinion.
OPINION
NIEMEYER, Circuit Judge:
This case presents the important question of whether South Carolina’s regulation establishing standards for licensing abortion clinics — Regulation 61-12 of the South Carolina Department of Health and Environmental Control, S.C.Code Ann. Regs. 61-12 (eff. June 28, 1996) — violates the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment by placing an undue burden on women’s decisions to seek abortions and by distinguishing between clinics that perform a specified number of abortions and those that do not. Two abortion clinics and an abortion provider filed this action, on behalf of themselves and their patients, facially challenging the constitutionality of the Regulation. The district court concluded that the Regulation violated both of these clauses of the Fourteenth Amendment, declared the Regulation “invalid,” and enjoined its enforcement.
As amplified herein, we reverse this decision and uphold the constitutionality of Regulation 61-12 because (1) the Regulation serves a valid state interest and is little more than a codification of national medical- and abortion-association recommendations designed to ensure the health and appropriate care of women seeking abortions; (2) the Regulation does not “strike at the [abortion] right itself,” Planned Parenthood v. Casey, 505 U.S. 833, 874, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (joint opinion of O’Connor, Kennedy, and Souter, JJ.); (3) the increased costs of abortions caused by implementation of the Regulation, while speculative, are even yet modest and have not been shown to burden the ability of a woman to make the decision to • have an abortion; and (4) abortion clinics may rationally be regulated as a class while other clinics or medical practices are not.
I
Prior to 1995, South Carolina regulated clinics at which second-trimester abortions *160 were performed. See S.C.Code Ann. §§ 44-41-20(b), -70(b) (Law.Coop.1985); S.C.Code Ann. Regs. 61-12 (1982) (entitled “Minimum Standards for Licensing Clinics Performing Abortions”). The regulation under this earlier statute contained chapters covering abortion-clinic management, laboratory facilities and procedures, medical records and reports, clinic design and construction, and patient-care areas. See S.C.Code Ann. Regs. 61-12 (1982).
In 1995, the South Carolina legislature amended its statute to require any “facility in which any second trimester or five or more first trimester abortions are performed in a month” to be licensed as an abortion clinic by the Department of Health and Environmental Control (“DHEC”). S.C.Code Ann. §§ 44-41-10(C), -75(A) (West Supp.1999). In addition, it directed the DHEC to
promulgate regulations concerning sanitation, housekeeping, maintenance, staff qualifications, emergency equipment and procedures to provide emergency care, medical records and reports, laboratory, procedure and recovery rooms, physical plant, quality assurance, infection control, and information on and access to patient follow-up care necessary to carry out the purposes of this section.
Id. § 44-41-75(B). The DHEC responded by promulgating Regulation 61-12, effective June 28, 1996. See S.C.Code Ann. Regs. 61-12 (West Supp.1998) (hereinafter “Regulation 61-12” or “the Regulation”).
In developing Regulation 61-12, the DHEC built on the preexisting version of its Regulation 61-12, as well as other DHEC regulations covering different types of healthcare facilities. The DHEC also consulted various medical standards and guidelines issued by medical care organizations, including groups dedicated to protecting abortion rights. These sources included: (1) Standards for Obstetric-Gynecologic Services (7th ed.1995), issued by the American College of Obstetricians and Gynecologists (“the ACOG”); (2) Manual of Medical Standards and Guidelines (1994), issued by Planned Parent-hood, which the manual describes as encouraging affiliates “to develop abortion services if such a need exists in the community and resources are available for conducting a safe and effective program”; and (3) Standards for Abortion Care (1988), a set of standards, the “purpose” of which is “to promote high quality care for all women seeking abortions” and “serve as a useful resource for local and state agencies charged with safeguarding the public’s health,” issued by the National Abortion Federation, which the standards describe as “an organization specifically committed to the provision and accessibility of high quality abortion services for all women.” The DHEC also reviewed abortion regulations from other states and referenced the Guidelines for Construction and Equipment of Hospital and Medical Facilities (1992-93), a document issued by the American Institute of Architects, which purports to provide “model standards” for “constructing and equipping new medical facility projects” and for “renovation or replacement work.”
In addition to consulting established sources, the DHEC conducted public hearings, during which it received suggestions from the abortion clinics that are parties to this case, incorporating some of them in new Regulation 61-12. The new Regulation, entitled “Standards for Licensing Aboi-tion Clinics,” S.C.Code Ann. Regs. 61-12 (West Supp.1998), contains ten parts which address a range of medical, safety, and administrative requirements:
Part I, “Definitions and Requirements for Licensure,” defines an abortion clinic as “[a]ny facility, other than a hospital ... in which any second trimester or five or more first-trimester abortions per month are performed.” Id. § 101(B). It makes the operation of an abortion clinic without a license illegal. See id. § 102(A). It provides for periodic inspections, including at least one annually, and grants inspectors the authority to copy all documents required in the course of inspections. See *161 id. § 102(F). And it authorizes sanctions for non-compliance with the Regulation in the form of monetary penalties, as well as denial, suspension, or revocation of the license. See id. § 103.
Part II, “Administration and Management,” requires every facility to formulate and review annually its policies and procedures. See id. § 201(B). It requires that each clinic maintain various administrative documents on file. See id. § 203. Every employee is required to complete in-service training and undergo a tuberculin skin test, see id. § 204(B), (F), and any employee diagnosed with a contagious disease is prohibited from performing certain work at the clinic, see id. § 204(D). It requires that every abortion be performed by a physician who is licensed by the State and requires that every clinic be affiliated with a physician who has admitting privileges at a local hospital. See id. § 205(C). A registered nurse must supervise all nursing care, and an ultrasound test may be conducted only by a person who has completed a course in ultrasonography. See id. § 205(D), (F). Each facility must display a copy of a statement specifying patients’ rights, including the rights to dignity, privacy, and safety. See id. § 209.
Part III, “Patient Care,” provides that each facility must have certain written patient-care policies and procedures to ensure professional and safe care and that no clinic may serve patients whose needs exceed the clinic’s resources and capabilities. See id. § 301. Specified drugs and tools must be present, see id. § 303, and laboratory services must be available, either on site or through an arrangement with a laboratory, see id. § 304(A). A number of laboratory tests must be performed, including a urinalysis and testing for sexually transmitted diseases. See id. § 304(B), (C), (D). Staff at abortion clinics must have admitting privileges at a local hospital or have documented arrangements for emergency transfer to a hospital. See id. § 305(A). And facilities that perform abortions beyond the 14th week of pregnancy must meet additional requirements. See id. § 309.
Part IV, “Medical Records and Reports,” requires that every abortion clinic maintain and retain for ten years specified categories of information and requires that the documents be treated as confidential. See id. §§ 401, 402. Abortion clinics must report to the DHEC all abortions performed, any fetal deaths meeting certain criteria, and any accidents or incidents. See id. § 403.
Part V, “Functional Safety and Maintenance,” requires written safety policies and procedures and a disaster-preparedness plan and sets standards for maintenance, requiring that facilities be kept in good repair. See id. §§ 501-503.
Part VI, “Infection Control and Sanitation,” requires certain daily sterilization procedures, see id. § 602, mandates proper laundering of linen and washable goods, see id. § 603, and requires the facility to be kept neat, clean, and free of insects, see id. § 604. Garbage and waste are required to be disposed of in a manner designed to prevent transmission of disease. See id. § 605. Outside areas must be maintained so as to minimize fire hazards, havens for insects and rodents, and unsafe conditions from accumulations of water, ice, and snow. See id. § 606.
Part VII, “Fire Protection and Prevention,” requires climes to have particular firefighting equipment and an evacuation plan and to conduct fire drills and inspections. See id. § 701.
Part VIII, “Design and Construction,” requires that each abortion clinic have facilities for the care of each patient that meet applicable design and construction laws. See id. §§ 801, 802. New buildings or additions must satisfy building code requirements. See id. §§ 803, 804. Each facility must provide an adequate number of examination or procedure rooms, and each procedure room must have a suitable table and other equipment. See id. § 807(A), (B). Recovery areas must meet *162 particular requirements and there must be a room for temporary storage of waste, as well as an area to accommodate sterilization procedures. See id. § 807(E), (F).
Part IX, “Prerequisites for Initial Licen-sure,” sets forth the necessary documentation for obtaining a license from the DHEC and the certification that must be acquired for various physical items.
Finally, Part X states that conditions which arise and have not previously been addressed in the Regulation must be managed in accordance with the best practices as interpreted by the DHEC.
On June 27, 1996, one day before Regulation 61-12 was to take effect, the Green-ville Women’s Clinic, the Charleston Women’s Medical Clinic, Inc., and Dr. William Lynn (collectively, the “abortion clinics”) brought this action seeking a declaratory judgment that Regulation 61-12 is unconstitutional on its face because, among other things, it would violate their due process and equal protection rights, as well as those of their patients. They also sought an order enjoining enforcement of the Regulation and requesting attorneys fees and costs pursuant to 42 IJ.S.C. § 1988. The district court issued a temporary restraining order on June 19,1996, which, by consent of the parties, was converted to a preliminary injunction. Finally, on February 5, 1999, the district court declared the Regulation invalid in its entirety.
The Greenville Women’s Clinic, which has operated in Greenville, South Carolina, since 1978, has two licensed physicians who perform a combined average of more than 2,700 abortions per year. The physicians at the clinic testified that even prior to the promulgation of Regulation 61-12, their clinic operated in substantial compliance with its requirements. They estimated that the additional cost of full compliance would be $22.68 per abortion. The district court found that, prior to the Regulation’s promulgation, the cost of an abortion was between $325 and $480 if the abortion was not complicated and was performed during the first trimester. The court found that the additional cost of full compliance for Greenville Women’s Clinic would be in the range of $23-$32 per abortion.
The Charleston Women’s Medical Clinic, Inc., which has operated in Charleston, South Carolina, for about 28 years, performs, on average, more than 2,400 abortions per year. That clinic is operated by a licensed physician and a licensed practical nurse. The district court found that compliance with Regulation 61-12 by the Charleston Women’s Medical Clinic would cost between $36 and $75 per abortion.
Dr. William Lynn, who is a licensed physician, has conducted his practice since 1980 from two locations — in Beaufort, South Carolina (approximately 70 miles southwest of Charleston) and in Greenville, South Carolina. Dr. Lynn performs, on average, more than 900 abortions each year at the two sites. He testified that Regulation 61-12 would require him to undertake costly modifications to his Beaufort facility, and the district court found that his cost per abortion would increase by an amount between $116 and $368. The district court also concluded that the increased costs for Dr. Lynn’s Beaufort facility would “likely force [Dr. Lynn] to cease performing abortions in his Beaufort office.” Greenville Women’s Clinic v. Bryant, 66 F.Supp.2d 691, 717 (D.S.C.1999).
There was no direct evidence about how many other abortion clinics in South Carolina would be affected by the Regulation or about the extent of any such impact. No woman who wanted an abortion or who claimed to be threatened by Regulation 61-12 was made a party to the action or testified before the district court, and no survey evidence of women in South Carolina was presented to demonstrate the likely effect that Regulation 61-12 would have on their decisions to obtain an abortion.
Following a bench trial, the district court concluded that the Regulation *163 “serve[s] no legitimate state interest ... [g]iven the lack of evidence that the regulation will operate to improve the health care currently being received in this state.” Greenville Women’s Clinic, 66 F.Supp.2d at 735. It continued that even if it did serve a valid purpose, the Regulation “places a substantial obstacle in the path of women seeking first trimester abortions and, thereby, imposes an undue burden on the woman’s fundamental right to choose to undergo the procedure.” Id. The undue burden, the court found, resulted from increased costs, delays in the ability to obtain abortions, decreased availability of abortion clinics, increased distances to travel to clinics, unlimited inspections of clinics, and compromises to patient confidentiality. See id. at 735-36. Accordingly, the court held that Regulation 61-12 violated women’s Fourteenth Amendment due process rights. See id. at 736. The district court also ruled that the Regulation violated the abortion clinics’ equal protection rights under either a strict scrutiny or a rational-basis standard of review because the Regulation “singles out physicians and clinics where abortions are performed regularly ... and imposes upon them requirements which are not imposed upon comparable procedures and not even upon all physicians who perform first trimester abortions.” Id. at 742. Finally, the district court, acting under 42 U.S.C. § 1988, awarded the abortion clinics attorneys fees and costs in the amount of $324,-040.
South Carolina appeals from the district court’s judgment declaring Regulation 61-12 unconstitutional and enjoining its enforcement and from the award of attorneys fees.
II
South Carolina contends first that the district court’s due process analysis is supported by neither the record nor the law. It maintains that Regulation 61-12, which is based on national healthcare standards for abortions, is rationally related to protecting the health of women seeking abortions, “even if such regulations might have the incidental [ejffect of causing the price to obtain an abortion to increase.” South Carolina notes that the abortion clinics and their experts agree as to the appropriateness of the national standards incorporated in the Regulation, and the Greenville Women’s Clinic, the largest of the plaintiffs, admitted that it was already in substantial compliance with virtually all of the Regulation’s-requirements. The State argues that to the extent any clinic does not comply with Regulation 61-12, compliance will improve the quality of medical care for women seeking abortions. South Carolina also argues that the evidence does not support the conclusion that the increased cost of an abortion would impose a substantial obstacle for women in South Carolina seeking abortions.
The abortion clinics respond that the Regulation does not further a valid state interest because (1) it creates costly and unnecessary requirements which are more likely to harm than to protect the health of abortion patients and (2) the DHEC’s drafting process indicates that the DHEC was not concerned with protecting the health of such women. The clinics acknowledge that the DHEC may have relied on standards and guidelines of national medical groups, but they argue that these are just that — standards and guidelines — and are neither designed to serve as mandatory directives nor appropriate for that purpose. Finally, the abortion clinics contend that, in any event, Regulation 61-12 imposes an undue burden on women seeking abortions in South Carolina because it would increase the price of abortions and force Dr. Lynn to cease performing abortions at his Beaufort facility.
The abortion clinics undertook a heavy burden in bringing a facial challenge to the constitutionality of Regulation 61-12. Because of the nature of facial challenges, they could not present the district court with a concrete factual circumstance — -a particular case or controversy — to which to *164 apply the Regulation. The clinics therefore must argue about the Regulation’s impact generally and prospectively, the type of action typically undertaken by legislatures, not courts. Because a trial on a facial challenge can focus only on arbitrarily selected hypotheticals to which the Regulation might apply, a court is required to speculate about the Regulation’s overall effect.
In this case, for example, the district court was not given — and could not be given — any data from South Carolina patients about the impact that particular costs had on their decision to seek an abortion. It was given only estimates by “experts.” Accordingly, the impact of the Regulation in any given situation could only have been anticipated. Such anticipation, However, is generally not an appropriate basis on which to strike down statutes and regulations. See Bowen v. Kendrick, 487 U.S. 589, 612-13, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988) (noting that “[i]t has not been the Court’s practice” to strike down a statute on a facial challenge “in anticipation” of particular circumstances, even if the circumstances would amount to a “likelihood”). •
Because of the conceptual difficulties that attend to ruling on the constitutionality of a statute in the abstract, the Supreme Court has held that “[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount' successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); see also Rust v. Sullivan, 500 U.S. 173, 183, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) (a facial challenge will fail if an act “can be construed in such a manner that [it] can be applied to a set of individuals without infringing upon constitutionally protected rights”).
In Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), the Supreme Court ruled that a statute regulating abortion was invalid because “in a large fraction of cases in which [it] is relevant, it will operate as a substantial obstacle to a woman’s choice to undergo an abortion.” Id. at 895, 112 S.Ct. 2791 (majority opinion) (emphasis added). Whether this holding displaced the Salerno standard for facial challenges in abortion cases has been the subject of considerable debate among the circuits. Compare, e.g., Planned Parenthood v. Lawall, 180 F.3d 1022, 1025-27 (9th Cir.1999) (applying Casey standard to facial challenge to abortion restriction); Women’s Med. Prof'l Corp. v. Voinovich, 130 F.3d 187, 193-96 (6th Cir.1997) (same); Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir.1996) (same); Planned Parenthood v. Miller, 63 F.3d 1452, 1456-58 (8th Cir.1995) (same); Casey v. Planned Parenthood, 14 F.3d 848, 863 n. 21 (3d Cir.1994) (same), with Barnes v. Moore, 970 F.2d 12, 14 n. 2 (5th Cir.1992) (per curiam) (“we do not interpret Casey as having overruled, sub silen-tio, longstanding Supreme Court precedent governing challenges to the facial constitutionality of statutes”); see also Okpalobi v. Foster, 190 F.3d 337, 354 (5th Cir.1999) (noting that subsequent Fifth Circuit decisions were arguably inconsistent with application of the Salerno standard). This circuit, sitting en banc, acknowledged the uncertainty as to which standard applies but declined to resolve the issue. See Planned Parenthood v. Camblos, 155 F.3d 352, 358-59 & n. 1 (4th Cir.1998) (en banc) (“Because we conclude ... that the [challenged abortion regulation] is facially constitutional under either the Salerno or the Casey standard, we need not, and do not, decide which of these two standards applies in facial challenges to abortion statutes”). Previously, a panel of this court had stated its agreement with the Fifth Circuit position in Barnes v. Moore, observing that until the Supreme Court specifically overrules Salerno in the abortion-regulation context, “this Court is bound to apply the Salerno standard as it has. been repeatedly applied in the context *165 of other abortion regulations reviewed by the Supreme Court ... and in the context of challenges to legislative acts based on other constitutional grounds.” Manning v. Hunt, 119 F.3d 254, 268 n. 4 (4th Cir. 1997) (emphasis added).
While we believe that the observation in Manning was part of the court’s holding because application of Salerno was necessary to the ruling in that case and not dictum, we add the observation that the logic of the Salerno test is necessary to show deference to legislatures, particularly in light of the limitation imposed by Article III of the Constitution that the judiciary act only in cases and controversies. See U.S. Const, art. Ill, § 2. As we explain below, when the abortion clinics are confronted with Salerno’s requirement that no set of circumstances exists under which Regulation 61-12 would be valid, they fail, if for no other reason, because the impact on the Greenville Women’s Clinic is so modest. Even when we apply a less deferential standard than that articulated in Salerno, we nevertheless conclude in this ease that the record provides no evidence from which to conclude that Regulation 61-12 would present a “substantial obstacle” to “a large fraction” of women in South Carolina who might seek an abortion at a clinic subject to Regulation 61-12. Casey, 505 U.S. at 895, 112 S.Ct. 2791 (majority opinion).
The record contains evidence from several abortion providers, only one of which would be adversely affected in any significant way in providing abortion services, Dr. Lynn’s Beaufort facility. Moreover, even for women in Beaufort, no evidence suggests that they could not go to the clinic in Charleston, some 70 miles away. Nor are we provided with evidence of the impact that Regulation 61-12 would have on other South Carolina abortion clinics. Thus, inherent in our discussion of the impact that Regulation 61-12 would have on women’s abortion rights is the inability to decide a concrete case; we must speculate about the impact on all relevant women to determine, under the Casey standard, whether a large fraction would encounter a substantial obstacle to their choice to seek an abortion, an analysis that the record simply does not permit. Thus, on the abortion clinics’ failure to present evidence that would satisfy either of the possible standards, we fall back on the Regulation’s presumptive constitutionality.
The principles of the abortion right itself are now well-established. Beginning in 1973, women were found to have a fundamental right grounded in the Fourteenth Amendment to end a pregnancy by aborting the life of the fetus. See Roe v. Wade, 410 U.S. 113, 153-56, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); see also Maher v. Roe, 432 U.S. 464, 474, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). The Court in Roe stated that the “right of privacy ... is broad enough to encompass a woman’s decision whether or not to terminate her pregnancy.” Roe, 410 U.S. at 153, 93 S.Ct. 705.
Following Roe, which recognized that the abortion-decision right was not absolute but subject to some regulation by the states, the Supreme Court decided numerous cases that uncovered difficulties in applying Roe and created widespread confusion. Accordingly, in 1992, the Court in Casey reexamined Roe and restated the applicable principles. In Casey, the Court rejected the trimester framework of Roe and adopted a revised “undue burden” standard to apply to challenged abortion regulations. Casey, 505 U.S. at 872-74, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.). But it reaffirmed the “essential holding” of Roe — that a woman has a constitutional right to “choose to have an abortion before viability and to obtain it without undue interference from the State.” Id. at 846, 112 S.Ct. 2791 (majority opinion). The scope of this right, however, is framed by the State’s “legitimate interests from the outset of the pregnancy in protecting the health of the *166 woman and the life of the fetus that may become a child.” Id.
Most recently, in Stenberg v. Carhart, 530 U.S.-, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), the Supreme Court reaffirmed the principles articulated in the joint opinion in Casey that: (1) a woman has a constitutional right “to choose to terminate her pregnancy” before viability of the fetus “undue burden” on the woman’s right to choose to terminate her pregnancy before fetal viability is unconstitutional; and (3) a State may regulate post-viability abortions “except where [they are] necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.” 530 U.S. at-, 120 S.Ct. at 2600 (internal quotation marks and citations omitted).
In preserving the right of a woman to choose to have an abortion, the Court in Casey emphasized that the right is grounded in the liberty protected by the Fourteenth Amendment — “[t]he controlling word in the cases before us is ‘liberty.’ ” 505 U.S. at 846, 112 S.Ct. 2791 (majority opinion); see also id. at 871, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.) (“The woman’s right to terminate her pregnancy before viability is ... a component of liberty”). And the liberty so recognized is defined as the right of a woman herself — not her husband, her parent, her doctor, or others — to make the decision to have an abortion. Id. at 877, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.); see also Stenberg, 530 U.S. at-, 120 S.Ct. at 2649. Only when the State unduly burdens the ability of a woman to make the abortion decision “does the power of the State reach into the heart of the liberty protected by the Due Process Clause.” Casey, 505 U.S. at 874, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.).
Accordingly, to the extent that state regulations interfere with the woman’s status as the ultimate decisionmaker or try to giv.e the decision to someone other than the woman, the Court has invalidated them. See Casey, 505 U.S. at 887-98, 112 S.Ct. 2791 (majority opinion) (striking down provision which required a physician performing an abortion on a married woman to obtain a statement from her indicating that she had notified her husband); Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 767, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (invalidating reporting requirements that “raise the specter of public exposure and harassment of women who choose to exercise their personal, intensely private, right, with their physician, to end their pregnancy”); Bellotti v. Baird, 443 U.S. 622, 643, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979) (plurality opinion) (ruling that “if the State decides to require a pregnant minor to obtain one or both parents’ consent to an abortion, it must also provide an alternative procedure whereby authorization for the abortion can be obtained” (footnote omitted)); Planned Parenthood v. Danforth, 428 U.S. 52, 74, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (holding that “the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient’s pregnancy”).
On the other hand, state regulations that do not “reach into the heart” of the protected liberty do not violate the abortion-decision right. Casey, 505 U.S. at 874, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.). If a regulation serves a valid purpose — “one not designed to strike at the right itself’— the fact that it also has “the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it.” Id. One such valid purpose is a State’s effort to “further the health or safety of a woman seeking an abortion.” Id. at 878, 112 S.Ct. 2791. Of course, if such health regulations are unnecessary and have the “purpose or effect of presenting a substantial obstacle to a woman seeking an abortion,” they will be *167 found to “impose an undue burden on the right.” Id.
In maintaining the distinction between state regulations that trammel the woman’s right to choose to have an abortion — • those that impose an undue burden — and those that merely have an incidental effect on the woman’s decision, the Court has upheld, both before Casey and in Casey, various regulations, the costs and effects of which, while amounting to interference and intrusion, did not reach the core of the protected liberty. See, e.g., Casey, 505 U.S. at 886, 112 S.Ct. 2791 (majority opinion) (upholding 24-hour waiting period although it would require a woman to make two visits to a doctor and increase the woman’s exposure to abortion protestors); id. at 900-01, 112 S.Ct. 2791 (upholding a recordkeeping and reporting provision that would increase the cost of some abortions); Webster v. Reproductive Health Services, 492 U.S. 490, 530, 109 S.Ct. 3040, 106 L.Ed.2d 410 (1989) (O’Connor, J., concurring) (regulation requiring medical tests is constitutional where “the cost of examinations and tests that could usefully and prudently be performed ... would only marginally, if at all, increase the cost of an abortion”); Planned Parenthood v. Ashcroft, 462 U.S. 476, 490, 505, 103 S.Ct. 2517, 76 L.Ed.2d 733 (1983) (upholding requirement for a pathology report that would impose a “small cost”). Only when the increased cost of abortion is prohibitive, essentially depriving women of the choice to have an abortion, has the Court invalidated regulations because they impose financial burdens. See Akron v. Akron Ctr. for Reproductive Health, 462 U.S. 416, 434-39, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983) (holding unconstitutional a hospitalization requirement for certain abortions that more than doubled the cost of such abortions).
In the ease before us, the South Carolina legislature directed the DHEC to promulgate regulations to address medical and safety aspects of providing abortions, as well as the recordkeeping and administrative practices of abortion clinics. As directed, the DHEC drafted Regulation 61-12, building on the existing regulation, which applied to second-trimester abortion clinics, and consulting abortion regulations from other states. The DHEC also obtained and incorporated guidelines for outpatient facilities published by the American Institute of Architects, as well as standards and guidelines issued by the ACOG, Planned Parenthood, and the National Abortion Federation. Indeed, Regulation 61-12 largely tracks these medical standards and guidelines.
For example, the National Abortion Federation requires that all medical staff at member,facilities be proficient in CPR, and the ACOG recommends specific plans for training personnel in CPR; Regulation 61-12 requires that all professional staff members be certified to perform CPR. See S.C.Code Ann. Regs. 61-12, § 204(C). The National Abortion Federation recommends that nursing-care providers receive training and orientation; the Regulation requires that each facility have and execute a written orientation program. See id. § 203(E). The ACOG recommends that physicians who perform abortions in their offices provide for prompt emergency treatment or hospitalization; the Regulation requires that each facility have an agreement with a doctor who has hospital admitting privileges. See id. § 205(C)(2). The National Abortion Federation recommends that a registered nurse or physician be responsible for a variety of components of the abortion procedure and requires that a registered nurse monitor recovering patients if general anesthesia has been used; the Regulation requires that a licensed registered nurse supervise nursing care. See id. § 205(D)(1). The National Abortion Federation requires that emergency drugs be kept on hand to treat seven specific conditions; the Regulation requires the availability of drugs to treat the exact same conditions. See id. § 303(A)(1). The National Abortion Federation states that testing for gonorrhea *168 and chlamydia may be routinely provided; the Regulation requires testing for gonorrhea and chlamydia prior to each abortion procedure. See id. § 304(C). The ACOG and the National Abortion Federation recommend that counseling be offered; the Regulation requires that arrangements be made for consultation. See id. § 307. The ACOG recommends retaining accurate medical records for each patient for the time period required by law; the Regulation requires that such records be retained for ten years. See id. § 401. The ACOG recommends specific plans and procedures ■for health and safety; the Regulation requires written policies and procedures for safety. See id. § 501. The ACOG recommends that the examining room contain facilities for sterilization; the Regulation sets out specific sterilization procedures. See id. § 602. The ACOG recommends procedures for disposing of contaminated waste supplies; the Regulation requires specific treatment of refuse and waste disposal. See id. § 605. The ACOG recommends procedures for proper use of fire equipment, and the National Abortion Federation recommends regular emergency drills; the Regulation requires firefighting equipment, alarm systems, and fire drills. See id. § 701. Planned Parenthood requires procedure rooms large enough to accommodate a stretcher or gurney, post-procedure recovery rooms, and dressing rooms, and the National Abortion Federation requires that the operating table be located in a room of adequate dimensions, illumination, and ventilation; the Regulation requires particular physical facilities at abortion clinics, such as procedure rooms with doors wide enough to accommodate a stretcher or wheelchair, recovery rooms, storage rooms, and a dressing room. See id. § 807. Planned Parenthood requires a battery-operated light source for emergency backup; the Regulation requires emergency power and lighting. See id. § 809.
The national standards promulgated by such medical groups as the ACOG, the National Abortion Federation, and Planned Parenthood indisputably aim to protect the health of women seeking abortions and one states explicitly that it is intended to “serve as a useful resource for local and state agencies charged with safeguarding the public’s health.” National Abortion Federation, Standards for Abortion Care (1998). In relying upon such standards, the DHEC was appropriately focused on ensuring that abortion is “performed by medically competent personnel under conditions insuring maximum safety for the woman.” Akron, 462 U.S. at 430 n. 12, 103 S.Ct. 2481 (quoting Connecticut v. Menillo, 423 U.S. 9, 11, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975) (per curiam)). A witness for the abortion cjinics testified that guidelines from organizations such as the ACOG and the National Abortion Federation “provide our best current assessment as to what is appropriate care.” The witness explained that the ACOG has “only one interest,” the healthcare of women, and if a doctor “deviate[s] from [the ACOG guidelines and standards] without a documented reason for [the] deviation, in a court of law it will be construed as malpractice.” The witness recognized that the ACOG’s guidelines “are commonly used and relied upon by obstetricians and gynecologists nationwide to determine the standard and the appropriate level of care for their patients,” and that the National Abortion Federation standards are “a distillate of extensive experience by highly skilled and experienced [abortion] providers.”
This testimony on behalf of the abortion clinics should itself be sufficient to establish that Regulation 61-12 was reasonably designed to promote South Carolina’s valid interest in women’s health. But the DHEC was also entitled to draw support for its use of the standards from the observations made by the Supreme Court in abortion cases that the ACOG and National Abortion Federation standards indicate the “general medical utility” of a particular procedure. Ashcroft, 462 U.S. at 487 n. 10, 103 S.Ct. 2517; see also Akron, 462 U.S. at *169 435-37, 103 S.Ct. 2481 (relying on changes in the ACOG standards, among others, to demonstrate lack of justification for hospitalization requirement); Simopoulos v. Virginia, 462 U.S. 506, 517, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983) (upholding abortion regulations after noting that “[o]n their face, the ... regulations appear to be generally compatible with accepted medical standards governing outpatient second-trimester abortions” (citing publications from groups including the ACOG)); see also Stenberg, 530 U.S. at -, 120 S.Ct. at 2612 (discussing the ACOG’s “medical opinion” in analyzing the appropriateness of “[mjedical treatments and procedures”). Regulation 61-12 thus indisputably represents a reasonable attempt to further the health of abortion patients in South Carolina.
The abortion clinics argue that Regulation 61-12 exceeds and, in some cases, conflicts with the recommendations of these national groups. Further, they assert that the recommendations are just that — recommendations—and that requiring clinics to follow them will not necessarily safeguard or improve the health of abortion patients. The abortion clinics also note that some officials of these medical groups do not support mandatory compliance with the recommendations.
While Regulation 61-12 does in some instances exceed the standards of the ACOG, Planned Parenthood, and the National Abortion Federation, the bulk of the provisions comport with those guidelines, and any deviations are not substantial. Any contrary claim is belied by the abortion clinics’ own testimony in this case. One of the doctors who owns the Green-ville Women’s Clinic, when asked whether Regulation 61-12 was “consistent with what you would consider to be the appropriate standards for abortion practice,” responded that “[mjost parts of the regulation we already comply with and do, but because it’s good medical practice.” Another abortion-clinic doctor testified that he complied with a number of the Regulation’s provisions because any doctor that’s licensed by the State of South Carolina and any doctor that’s completed an OB/ GYN residency successfully would do that in the normal operation.” The fact that not all healthcare professionals agree with the adoption of each specific aspect of the Regulation is immaterial in light of South Carolina’s “considerable discretion” in adopting licensing requirements aimed at the health of women seeking abortions. Simopoulos, 462 U.S. at 516, 103 S.Ct. 2532 (“In view of its interest in protecting the health of its citizens, the State necessarily has considerable discretion in determining standards for the licensing of medical facilities”).
Moreover, contrary to the district court’s suggestion, see Greenville Women’s Clinic, 66 F.Supp.2d at 732, there is no requirement that a state refrain from regulating abortion facilities until a public-health problem manifests itself. In Dan-forth, for example, the Court upheld health measures that “may be helpful” and “can be useful.” 428 U.S. at 80, 81, 96 S.Ct. 2831. It cannot be gainsaid that a regulation incorporating the recommendations of the leading institutional authorities in the field of abortion provision aims to “further the health or safety of a woman seeking an abortion.” Casey, 505 U.S. at 878, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.). Because South Carolina’s Regulation 61-12 “appearfs] to be generally compatible' with accepted medical standards governing ... abortions,” Simopoulos, 462 U.S. at 517, 103 S.Ct. 2532, we cannot reasonably conclude that the Regulation was not directed at promoting South Carolina’s valid interest in a woman’s health.
Even though Regulation 61-12 is directed at the valid objective of safeguarding the health of women seeking abortions, it may still be invalid if, in serving this objective, it unduly burdens “a woman’s ability to make th[e] decision” to terminate a pregnancy. Casey, 505 U.S. at 874, 112 S.Ct. 2791 (joint opinion of O’Connor, Ken *170 nedy, and Souter, JJ.). Thus, having determined that Regulation 61-12 serves a valid purpose, we must still consider whether the cost imposed by the lawfully directed regulation presents “a substantial obstacle to a woman seeking an abortion.” Id. at 878, 112 S.Ct. 2791. But a regulation is not rendered invalid simply because it makes it “more difficult or more expensive to procure an abortion,” id. at 874, 112 S.Ct. 2791, as “[a]ll abortion regulations interfere to some degree with a woman’s ability to decide whether to terminate her pregnancy,” id. at 875, 112 S.Ct. 2791. In making this undue-burden assessment, the Supreme Court has repeatedly emphasized that the focus must be aimed more directly at the ability to make a decision to have an abortion as distinct from the financial cost of procuring an abortion.
The district court found that enforcement of Regulation 61-12 would increase the cost of obtaining an abortion in varying amounts, depending on the abortion clinic. The Greenville Women’s Clinic, which purports to follow national medical standards for providing abortions, indicated that it substantially complies with the requirements of Regulation 61-12 and that full compliance would cost about $23. At the Charleston Women’s Medical Clinic, the cost increase would be between $36 and $75. On the other hand, Dr. Lynn, who operates abortion clinics in Beaufort and Greenville, testified that he would have to make so many' changes to his Beaufort facility that compliance would require him to cease providing abortions at that facility-
The record does not contain information indicating the manner in which Regulation 61-12 would actually affect any South Carolina woman’s decision to seek an abortion. This is not due to a failure of proof but a problem inherent in conducting a facial challenge to the Regulation. The most that the parties could do in a preenforcement case is to speculate about the Regulation’s impact. While they can reasonably forecast some cost increases, they can only surmise how any cost increase would affect a particular woman’s decision to seek an abortion.
Even accepting the speculative figures relied upon by the district court, we believe the court erred in concluding that at the two major clinics in this case — the Greenville Women’s Clinic and the Charleston Women’s Medical clinic — the impact from the expense of implementing Regulation 61-12 was unduly burdensome. While the $23-$75 increased cost per abortion due to compliance might make it “more difficult” and would make it “more expensive to procure an abortion,” there is no evidence that it would impose an undue burden on “a woman’s ability to make th[e] decision to have an abortion.” Casey, 505 U.S. at 874, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.). As to Dr. Lynn’s Beaufort clinic, no evidence suggests that women in Beaufort could not go to the clinic in Charleston, some 70 miles away.
Both Casey and pre-Casey decisions support the conclusion that predicted costs to raise medical standards do not amount to an undue burden on a woman’s choice to obtain an abortion. In Casey, the Court considered a mandatory 24-hour waiting period, which the lower court had found would often cause “a delay of much more than a day because the waiting period requires that a woman seeking an abortion make at least two visits to the doctor” and would increase the exposure of women seeking abortions to the “harassment and hostility of anti-abortion protestors.” 505 U.S. at 886, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.). As a result, the lower court concluded that the State regulation would especially burden women with the fewest financial resources, who had to travel long distances, and who needed to explain their absences to them husbands or to others. See id. Yet the Supreme Court upheld the provision, stating that “on the record before us, and in the context of this facial challenge, we are not convinced that the 24-hour waiting *171 period constitutes an undue burden.” Id. at 887, 112 S.Ct. 2791 (emphasis added). The Casey Court also upheld a record-keeping and reporting provision, under which every facility that performed abortions had to file with the State a detailed report on every abortion, as well as quarterly statistical data. Because this information was a “vital element of medical research,” it could not “be said that the requirements serve no purpose other than to make abortions more difficult,” even though the provision “might increase the cost of some abortions by a slight amount.” Id. at 901, 112 S.Ct. 2791 (majority opinion).
Similarly, in Ashcroft, the Court upheld a reporting requirement because, “[o]n its face and in effect,” it was reasonably related to accepted medical standards and constituted common medical practice, 462 U.S. at 487, 505, 103 S.Ct. 2517, even though the provision raised the cost of an abortion, see id. at 490, 103 S.Ct. 2517. In contrast, the Court in Akron struck down a provision requiring that all second-trimester abortions be performed in a hospital because the evidence indicated that the cost of an abortion would double and second-trimester abortions were “rarely performed” in hospitals. 462 U.S. at 435, 103 S.Ct. 2481.
In the case before us, as in Casey, the district court found that the Regulation would “caus[e] delays in the woman’s financial ability to obtain an abortion” and would “increas[e] the distance a woman has to travel to obtain an abortion,” thereby increasing the cost of an abortion. 66 F.Supp.2d at 735. But again, in the context of a facial challenge and in the absence of any evidence in the record about how the cost would affect women’s ability to make a decision, we conclude that the clinics have failed to demonstrate that the Regulation places any serious burden on a woman’s ability to make an abortion decision.
Moreover, the increased costs claimed by the three abortion providers are particularly modest when one considers that their purpose is to protect the health of women seeking abortions. And there is no evidence that the ability of any woman to obtain an abortion or to decide to obtain an abortion would be frustrated by these particularized costs. To conclude that any of the figures in this case would place an obstacle in the path of a woman’s right to choose to have an abortion would necessitate the formulation of an arbitrary cost threshold beyond which a price increase may not pass. This would irrationally hamstring the State’s effort to raise the standard of care in certain abortion clinics, the procedures and facilities of which do not adequately safeguard the health of their patients, simply because the clinics’ performance falls so far below appropriate norms that the expense of upgrading their practices and equipment exceeds the arbitrarily defined amount.
Nor does it unduly burden a woman’s right to decide to obtain an abortion that DHEC officials may inspect abortion clinics and copy necessary documents. Such inspections ensure compliance with healthcare standards, an end which the copying provision also furthers. See Danforth, 428 U.S. at 79, 81, 96 S.Ct. 2831 (noting that a statute which allowed medical records to “be inspected and health data acquired by local, state, or national public health officers” did not have a “legally significant impact or consequence on the abortion decision or on the physician-patient relationship” (internal quotation marks omitted)). This is particularly so in view of the Regulation’s requirement that “[a]ll records shall be treated as confidential,” thereby respecting patients’ privacy. See id. at 80, 96 S.Ct. 2831 (noting that proper respect for patient’s confidentiality was a factor in upholding reporting requirement); cf. Whalen v. Roe, 429 U.S. 589, 602 & n. 29, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977) (“disclosures of private medical information to ... public health agencies are often an essential part of modern medical practice even *172 when the disclosure may reflect unfavorably on the character of the patient”).
In short, South Carolina Regulation 61-12 serves a valid purpose, “one not designed to strike at the right itself,” and it is not invalid simply because it has the incidental effect of making it modestly more difficult or more expensive to procure an abortion. Casey, 505 U.S. at 874, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.).
Ill
South Carolina also contends that the district court erred in finding that Regulation 61-12 violates the Equal Protection Clause. The Regulation applies to facilities that perform one second-trimester abortion or five or more first-trimester abortions per month, but does not apply to facilities that perform fewer than five abortions per month or that perform no abortions at all. South Carolina argues that this classification is rationally related to its interests in regulating those facilities that perform abortions on a regular basis and notes that an abortion is recognized to be “a unique act fraught with consequences that go beyond mere medical complications.”
The abortion clinics argue that because Regulation 61-12 “targets abortion providers and their patients, treats them differently than providers and patients of comparable medical procedures, and directly impacts the exercise of the right to abortion,” we must review the Regulation under a standard of strict scrutiny. The abortion clinics contend that, under the strict-scrutiny standard, the Regulation cannot be upheld because it is not narrowly drawn to protect the health of women seeking abortions since their safety “is no more or less compelling than the safety of patients undergoing comparable procedures,” which the State does not regulate.
At its essence, the Equal Protection Clause requires that “all persons similarly situated ... be treated alike.” Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985); Reed v. Reed, 404 U.S. 71, 77, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). But this directive does not deny States “the power to treat different classes of persons in different ways.” Reed, 404 U.S. at 75, 92 S.Ct. 251. Most regulations define groups to which they apply or to which benefits are conferred and when any such group is defined, of necessity, the regulation favors or disadvantages other groups. See Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). To withstand scrutiny under the Equal Protection Clause, therefore, a classification generally “must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation.” Reed, 404 U.S. at 76, 92 S.Ct. 251 (internal quotation marks and citation omitted). If, however, a regulation “impinges upon a fundamental right protected by the Constitution,” Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 54, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983), or “operates to the peculiar disadvantage of a suspect class,” Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976), then the classification will be strictly scrutinized. While classifications in legislation ordinarily will be upheld against an equal protection challenge if “there is any reasonably conceivable state of facts that could provide a rational basis for the classification,” FCC v. Beach Communications, Inc., 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993), a regulation subject to strict scrutiny will be upheld only if it is justified by a compelling state interest, see Roe, 410 U.S. at 155, 93 S.Ct. 705.
In Roe, the abortion-decision right was found to be fundamental. 410 U.S. at 154-55, 162-63, 93 S.Ct. 705; see also Maher v. Roe, 432 U.S. 464, 474, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977). But following Casey, that conclusion may be in doubt. The Casey decision does not refer to the abor *173 tion-derision right as fundamental and does not apply the traditional strict-scrutiny standard which protects fundamental rights. Rather, the Court adopted an “undue burden” standard. Casey, 505 U.S. at 874, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.); see also Stenberg, 530 U.S. at -, 120 S.Ct. at 2636. Indeed, any regulation that does not “strike at the [abortion] right itself’ is assessed by asking not whether it serves a compelling state interest, but whether it “serves a valid purpose.” Casey, 505 U.S. at 874, 112 S.Ct. 2791 (joint opinion of O’Connor, Kennedy, and Souter, JJ.) (emphasis added). The dissenting opinion by Chief Justice Rehnquist characterizes the joint opinion in Casey as follows:
Roe decided that a woman had a fundamental right to an abortion. The joint opinion rejects that view. Roe decided that abortion regulations were subject to “strict scrutiny” and could be justified only in the light of “compelling State interests.” The joint opinion rejects that view.
Id. at 954, 112 S.Ct. 2791 (Rehnquist, C.J., dissenting).
But because we have concluded in Part II that South Carolina’s Regulation 61-12 does not place an undue burden on a woman’s ability to make an abortion decision, there is no need to resolve whether it remains a fundamental right for an equal protection analysis and thus requires application of the strict-scrutiny standard. See Harris v. McRae, 448 U.S. 297, 312, 322, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (having concluded that a law restricting federal funding for abortion violated no constitutionally protected right, the Court held it was unnecessary to analyze whether the law infringed a fundamental right for equal protection purposes). And likewise the equal protection analysis of a regulation applicable to abortion clinics, and not other medical clinics, would not be conducted under the strict-scrutiny standard. No authority exists to support a conclusion that abortion clinics or abortion providers have a fundamental liberty interest in performing abortions free from governmental regulation. See, e.g., Birth Control Centers, Inc. v. Reizen, 743 F.2d 352, 358 (6th Cir.1984). Moreover, physicians as a group are not a suspect class. See Attorney Gen. of New York v. Soto-Lopez, 476 U.S. 898, 906 n. 6, 106 S.Ct. 2317, 90 L.Ed.2d 899 (1986) (recognizing suspect classifications to include those based on race, alienage, or national origin). Accordingly, because we are not considering a regulation that impinges on a fundamental right or that is directed at a suspect class, we review South Carolina Regulation 61-12 under the Equal Protection Clause by applying a rational-basis standard to determine whether the Regulation’s classification of physicians who perform one second-trimester abortion or five or more first-trimester abortions per month is rationally related to a valid governmental purpose.
The rationality of distinguishing between abortion services and other medical services when regulating physicians or women’s healthcare has long been acknowledged by Supreme Court precedent. Beginning with Roe itself, the Court recognized not only the special medical interest of the women seeking abortions but also the State’s interest in protecting prenatal life. See 410 U.S. at 150, 93 S.Ct. 705. The long stream of cases that followed Roe has only heightened an awareness that for purposes of regulation, abortion services are rationally distinct from other routine medical services, if for no other reason than the particular gravitas of the moral, psychological, and familial aspects of the abortion decision. As the Court in Casey observed:
[T]he abortion decision ... is more than a philosophic exercise. Abortion is a unique act. It is an act fraught with consequences for others: for the woman who must live with the implications of her decision; for the persons who perform and assist in the procedure; for the spouse, family, and society which *174 must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life; and, depending on one’s beliefs, for the life or ■potential life that is aborted.
Casey, 505 U.S. at 852, 112 S.Ct. 2791 (majority opinion). Similarly in Hams, the Supreme Court noted that it was rational for Congress to authorize federal reimbursement for medical necessities, but not for medically necessary abortions: “Abortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life.” 448 U.S. at 325, 100 S.Ct. 2671 (emphasis added). And again in Danforth, the- Court rejected the argument that “the State should not be able to impose any recordkeeping requirements [on abortion providers] that significantly differ from those imposed with respect to other, and comparable, medical or surgical procedures.” 428 U.S. at 80-81, 96 S.Ct. 2831. In the same case, the Court applied the identical analysis to uphold a provision requiring that a woman certify in writing that her consent to the abortion was freely given and not the result of coercion, “[djespite the fact that apparently no other ... statute ... requires a patient’s prior written consent to a surgical procedure.” Id. at 66-67, 96 S.Ct. 2831.
We thus conclude that South Carolina has a rational basis for regulating abortion clinics while not regulating other healthcare facilities. See Williamson v. Lee Optical, 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955) (“The problem of legislative classification is a perennial one, admitting of no doctrinaire definition.... [T]he reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.... The legislature may select one phase of one field and apply a remedy there, neglecting the others”).
The only question remaining is whether the line drawn by Regulation 61-12 at five abortions per month is rationally related to its purpose of protecting the health of abortion patients. When it is recognized that the State interest is in regulating those facilities that are in the business of providing abortions, drawing the line at those performing five abortions per month is rational. While anyone could say that it is just as rational to draw the line at ten abortions per month or three abortions per month, this type of line-drawing is typically a legislative function and is presumed valid. See Murgia, 427 U.S. at 314, 96 S.Ct. 2562. Indeed, line-drawing of this type is not only typical of legislation, it is necessary. Thus, the Americans With Disabilities Act provides that the right to be free from discrimination because of one’s disability is granted to an employee of a company with 15 employees, but not to an employee of a company with only 14 employees. See 42 U.S.C. § 12111(5)(A). Similarly, Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, religion, sex, or national origin by employers with 15 or more employees, but not employers with 14 or fewer employees. See 42 U.S.C. § 2000e(b). The statute books are filled with similar examples. See, e.g., the Family and Medical Leave Act, 29 U.S.C. § 2611(2) (giving rights only to employees employed 12 months or longer); the Comprehensive Crime Control Act of 1984, 18 U.S.C. § 3559(c)(1) (mandating a sentence of life imprisonment for persons convicted of three serious violent felonies). In a similar vein, South Carolina permits persons 16 years or older to obtain a driver’s license, denying a license to persons 15 years or younger. See S.C.Code § 56-1-40; see also S.C. Const, art. XVII, § 14 (persons 18 years or older have “full legal rights and responsibilities”). In each of these instances, persons falling on one side of the line are treated differently from those on the other. But this result is inherent in legislation. Under rational-basis review, we need to determine only whether the line is drawn in a manner that reasonably furthers the legislative concern.
*175 In this case, South Carolina elected to regulate the business of providing abortions and determined that five per month would distinguish the abortion clinic from the facility performing abortions incidental to another medical practice. The selection of this number is reasonably related to the State’s legitimate interest in promoting and protecting the health of women visiting abortion clinics, and therefore the actual placement of the line is not a decision that the courts may second-guess. No more than the abortion regulations examined by the Supreme Court in Danforth and Harris does the South Carolina regulation before us contravene the limitations of the Equal Protection Clause.
IV
It is regrettable that our good colleague in dissent would rule on the basis that abortion is like any other simple medical procedure that is directed at injury or disease. Thought of in this way, it is understandable that he, like the district court, might find many of South Carolina’s regulations unnecessary. Why have inspections, keep records, and minimize the medical risks for only the abortion procedure, when such a protocol is not mandated for comparable medical practices addressing injury and disease? But the importance of the deeply divided societal debate over the morality of abortion and the weight of the interests implicated by the decision to have an abortion can hardly be overstated. As humankind is the most gifted of living creatures and the mystery of human procreation remains one of life’s most awesome events, so it follows that the deliberate interference with the process of human birth provokes unanswerable questions, unpredictable emotions, and unintended social and, often, personal consequences beyond simply the medical ones.
In adopting an array of regulations that treat the often relatively simple medical procedures of abortion more seriously than other medical procedures, South Carolina recognizes the importance of the abortion practice while yet permitting it to continue, as protected by the Supreme Court’s cases on the subject. A woman in South Carolina who has determined to abort the life of a fetus can do so without significant interference from South Carolina’s regulations and be assured thereby of a dignified and safe procedure. That these regulations impose a modest cost increase for increased medical safety and a modest compromise to privacy in the form of inspections and recordkeeping serves the complex public interests on the subject— the interests expressed by both those who favor abortion and those who oppose it.
Society’s last word on this subject has not been spoken. But South Carolina’s regulations incidental to the exercise of the abortion right should, in the meantime, be respected.
V
Because we reverse the district court’s judgment finding Regulation 61-12 unconstitutional, we also reverse the district court’s award of attorneys fees made under 42 U.S.C. § 1988 to the abortion clinics. The clinics are no longer prevailing parties. See Alexander S. v. Boyd, 113 F.3d 1373, 1388 (4th Cir.1997); Clark v. Township of Falls, 890 F.2d 625, 626-27 (3d Cir.1989).

REVERSED