# United States Court of Appeals
## For the First Circuit

No. 04-1161

PLANNED PARENTHOOD OF NORTHERN NEW ENGLAND, ET AL.,
CONCORD FEMINIST HEALTH CENTER, FEMINIST HEALTH
CENTER OF PORTSMOUTH, AND WAYNE GOLDNER, M.D.,
Plaintiffs, Appellees,

v.

PETER HEED,
ATTORNEY GENERAL OF THE STATE OF NEW HAMPSHIRE,
IN HIS OFFICIAL CAPACITY,
Defendant, Appellant.

―――――――――――

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE
[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

―――――――――――

Before

Boudin, Chief Judge,
Torruella, Circuit Judge,
and Saris,[*] District Judge.

―――――――――――

Daniel J. Mullen, Associate Attorney General, with whom
Suzanne M. Gorman, Senior Assistant Attorney General, and Andrew B.
Livernois, Assistant Attorney General, were on brief, for
appellant.
Teresa Stanton Collett, Professor of Law University of St.
Thomas School of Law, Minneapolis, MN, was on brief, for amici
curia New Hampshire Legislators in support of appellant.
Dara Klassel, with whom Martin P. Honigberg, Sulloway &
Hollis, PLLC, Jennifer Dalven, Corinne Schiff, Lawrence A.
Vogelman, and Shuchman, Krause & Vogelman, PLLC, were on brief, for
appellees.

―――――――――――

November 24, 2004

―――――――――――

―――――――――――

[*] Of the District of Massachusetts, sitting by designation.

**TORRUELLA, Circuit Judge**. Defendant-appellant Attorney General of the State of New Hampshire, Peter Heed, acting in his official capacity ("Attorney General"), appeals the district court's order declaring unconstitutional and enjoining the enforcement of the Parental Notification Prior to Abortion Act (the "Act"), 2003 N.H. Laws 173, codified at N.H. Rev. Stat. Ann. ("RSA") § 132:24-28 (2003).

## I.  Background

In June 2003, the New Hampshire legislature passed "AN ACT requiring parental notification before abortions may be performed on unemancipated minors," which states that:

> No abortion shall be performed upon an unemancipated minor or upon a female for whom a guardian or conservator has been appointed pursuant to RSA 464-A because of a finding of incompetency, until at least 48 hours after written notice of the pending abortion has been delivered in the manner specified in paragraphs II and III.

RSA 132:25, I.[1] Paragraph II specifies that "written notice shall be addressed to the parent at the usual place of abode of the parent and delivered personally to the parent by the physician or an agent." RSA 132:25, II. Paragraph III allows for notification by certified mail with return receipt requested and with restricted delivery to the addressee. RSA 132:25, III.

> The notice requirement is waived if
>
> (a) The attending abortion provider certifies in the pregnant minor's medical record that the abortion is necessary to prevent the minor's death and there is insufficient time to provide required notice; or
> (b) The person or persons who are entitled to notice certify in writing that they have been notified.

RSA 132:26, I.

If a minor does not want her parent or guardian notified, she may request a state judge, after a hearing, to "authorize an abortion provider to perform the abortion if said judge determines that the pregnant minor is mature and capable of giving informed

---

[1] The Act defines an abortion as:

> the use or prescription of any instrument, medicine, drug, or any other substance or device intentionally to terminate the pregnancy of a female known to be pregnant with an intention other than to increase the probability of a live birth, to preserve the life or health of the child after live birth, or to remove an ectopic pregnancy or the products from a spontaneous miscarriage.

RSA 132:24, I.

consent to the proposed abortion," or if the judge determines that "the performance of an abortion upon her without notification of her parent, guardian, or conservator would be in her best interests." RSA 132:26, II. In these proceedings, the pregnant minor may act on her own behalf or be appointed a guardian ad litem, and she must also be advised that she has a right to request court-appointed counsel. RSA 132:26, II (a). The court proceedings "shall be confidential and shall be given such precedence over other pending matters so that the court may reach a decision promptly and without delay so as to serve the best interest of the pregnant minor." RSA 132:26, II (b). Specifically, "[i]n no case shall the court fail to rule within 7 calendar days from the time the petition is filed." RSA 132:26, II (b). The judge must also "make in writing specific factual findings and legal conclusions," and order a record of the evidence to be maintained. RSA 132:26, II (b).

If the minor's petition is denied, an "expedited confidential appeal shall be available," and the appellate court must rule within seven calendar days of the docketing of the appeal. Access to the trial and appellate courts for the purposes of these petitions "shall be afforded such a pregnant minor 24 hours a day, 7 days a week." RSA 132:26, II (c).

Violation of the Act can result in criminal penalties and civil liability:

> Performance of an abortion in violation of
> this subdivision shall be a misdemeanor and
> shall be grounds for a civil action by a
> person wrongfully denied notification. A
> person shall not be held liable under this
> section if the person establishes by written
> evidence that the person relied upon evidence
> sufficient to convince a careful and prudent
> person that the representations of the
> pregnant minor regarding information necessary
> to comply with this section are bona fide and
> true, or if the person has attempted by
> reasonable diligence to deliver notice, but
> has been unable to do so.

RSA 132:27. The Act was to take effect on December 31, 2003. 2003 N.H. Laws 173.

On November 17, 2003, plaintiffs-appellees Planned Parenthood of Northern New England, Concord Feminist Health Center of Portsmouth, Feminist Health Center of Portsmouth, and Wayne Goldner, M.D. ("plaintiffs") filed a complaint under 42 U.S.C. § 1983, seeking a declaratory judgment that the Act is unconstitutional and a preliminary injunction to prevent its enforcement once it became effective.[2] The district court merged

---

[2] Citing Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992), amici New Hampshire Legislators argue that appellee abortion providers lack standing to challenge the Act because the injury giving rise to standing is speculative. The injury in question, according to amici, is the one suffered by pregnant minors who require an abortion for health reasons. Amici argue that it is "not sufficient to merely show that some unknown medical conditions exist that may at some unknown future date be suffered by some unknown minors." Brief of Amici New Hampshire Legislators at 8. In fact, Dr. Wayne Goldner listed in his unopposed declaration five specific conditions that could require abortion to protect a minor's health: preeclampsia, eclampsia, premature rupture of the membranes surrounding the fetus, spontaneous chorioamnionitis, and heavy bleeding during pregnancy. Declaration of Wayne Goldner,

the preliminary and permanent injunction proceedings and, on December 29, 2003, issued an order holding the Act unconstitutional and permanently enjoining its enforcement.

The district court found unconstitutional both (1) the lack of an explicit exception to protect the health of the pregnant minor, and (2) the narrowness of the Act's exception for abortions necessary to prevent the minor's death. Having found the Act fatally flawed in these respects, the district court declined to rule on the constitutionality of the Act's failure to provide specific protections for the confidentiality of a minor seeking a judicial waiver.

The Attorney General, acting in his official capacity, appeals.

---

M.D., ¶¶ 8-15. Moreover, appellee abortion providers themselves face an imminent injury -- civil or criminal prosecution for performing an abortion in violation of the Act -- sufficient to confer on them Article III standing. See Planned Parenthood of Cent. Mo. v. Danforth, 428 U.S. 52, 62 (1976) (holding that physician abortion providers asserting their own rights and those of their patients had standing to challenge abortion regulation and "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief"). Because of their close relationship to the abortion decision, and the rights involved, providers routinely have jus tertii standing to assert the rights of women whose access to abortion is restricted. See Singleton v. Wulff, 428 U.S. 106, 117 (1976) ("[I]t generally is appropriate to allow a physician to assert the rights of women patients as against governmental interference with the abortion decisions . . . ."). Indeed, as the Ninth Circuit has noted, "physicians and clinics performing abortions are routinely recognized as having standing to bring broad facial challenges to abortion statutes." Planned Parenthood of Idaho, Inc. v. Wasden, 376 F.3d 908, 916-18 (9th Cir. 2004) (discussing abortion providers' third-party standing and citing cases).

## II. **Analysis**

We review the district court's decision regarding the constitutionality of a statute <u>de</u> <u>novo</u>. <u>United States</u> v. <u>Lewko</u>, 269 F.3d 64, 67 (1st Cir. 2001).

The Attorney General argues that in deciding whether the Act is facially invalid we should apply the "no set of circumstances" standard set forth in <u>United States</u> v. <u>Salerno</u>, 481 U.S. 739 (1987).[3] This standard requires plaintiffs challenging a state law as facially invalid to show that "no set of circumstances exists under which the Act would be valid." <u>Id.</u> at 745. The Attorney General's argument rests on the premise that the <u>Salerno</u> standard is applicable to the Act despite the agreement of a plurality of Justices in <u>Planned Parenthood of S.E. Pa.</u> v. <u>Casey</u>, 505 U.S. 833, 876-77 (1992), that a law which "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" places an unconstitutional "undue burden" on the exercise of her right to choose abortion. A majority of the <u>Casey</u> Court applied that standard to determine that an abortion regulation is facially invalid if "in a large fraction of cases in which [the regulation]

---

[3] In <u>Salerno</u>, the Court considered a facial challenge to the Bail Reform Act, 18 U.S.C. § 3142(e), which permits pretrial detention on the ground of dangerousness. The Court held that the provision in question, which was accompanied by strict procedural safeguards, did not constitute a facial violation of the Due Process or Excessive Bail clauses of the Constitution. <u>Salerno</u>, 481 U.S. at 755.

is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion," thus imposing an "undue burden." Id. at 895 (per Justices O'Connor, Kennedy, and Souter, joined by Justices Stevens and Blackmun). The Court has since confirmed that "'a law designed to further the State's interest in fetal life which imposes an undue burden on the woman's decision before fetal viability' is unconstitutional." Stenberg v. Carhart, 530 U.S. 914, 921 (2000) (quoting Casey, 505 U.S. at 877); see also id. at 945-46 (declaring Nebraska ban on so-called "partial birth abortion" unconstitutional under undue burden standard).

Despite the Supreme Court's clear application of the undue burden standard in Casey and Stenberg, it has never explicitly addressed the standard's tension with Salerno. In the instant case, while recognizing that this court has yet to address the issue, the district court followed the majority of circuits that apply the Casey and Stenberg standard to legislation regulating abortion. The Attorney General notes that the Supreme Court applied the Salerno standard in the abortion context prior to Casey, see, e.g., Ohio v. Akron Ctr. for Reprod. Health, 497 U.S. 502, 514 (1990), and urges us to follow the Fifth Circuit's decision in Barnes v. Moore, 970 F.2d 12, 14 n.2 (5th Cir. 1992), that Casey does not displace Salerno's "no set of circumstances" test for facial challenges to abortion regulation. See also Causeway Med. Suite v. Ieyoub, 109 F.3d 1096, 1102-03 (5th Cir.

1997) (declining to reverse <u>Barnes</u>).  The overwhelming majority of circuits to address this issue, however, have disagreed with the Fifth Circuit.[4]  <u>See</u>, <u>e.g.</u>, <u>Planned Parenthood of Cent. N.J.</u> v. <u>Farmer</u>, 220 F.3d 127, 142-43 (3d Cir. 2000) (holding undue burden standard, instead of <u>Salerno</u> standard, applies in abortion context after <u>Casey</u>); <u>Planned Parenthood of S. Ariz.</u> v. <u>Lawall</u>, 180 F.3d 1022, 1025-26 (9th Cir. 1999) (noting inconsistency between <u>Casey</u> and <u>Salerno</u>, and following "great weight of circuit authority holding that <u>Casey</u> has overruled <u>Salerno</u> in the context of facial challenges to abortion statutes"), <u>amended on denial of reh'g</u>, 193 F.3d 1042 (9th Cir. 1999); <u>Women's Med. Prof. Corp.</u> v. <u>Voinovich</u>, 130 F.3d 187, 193-96 (6th Cir. 1997) (holding that <u>Casey</u> effectively overruled <u>Salerno</u>), <u>cert. denied</u>, 523 U.S. 1036 (1998); <u>Jane L.</u> v. <u>Bangerter</u>, 102 F.3d 1112, 1116 (10th Cir. 1996) (observing that Supreme Court applied undue burden test instead of <u>Salerno</u> test in <u>Casey</u>, rendering undue burden "the proper test after <u>Casey</u>"), <u>cert. denied sub nom.</u>, <u>Leavitt</u> v. <u>Jane L.</u>, 520 U.S.

---

[4]  Only the Fourth Circuit has been sympathetic to the <u>Barnes</u> approach, indicating that it might continue to apply <u>Salerno</u>.  <u>See</u> <u>Manning</u> v. <u>Hunt</u>, 119 F.3d 254, 268 n.4 (4th Cir. 1997) ("not[ing] in passing" that a court is bound to apply <u>Salerno</u> in abortion context unless the Supreme Court explicitly overrules it); <u>Greenville Women's Clinic</u> v. <u>Bryant</u>, 222 F.3d 157, 164-65 (4th Cir. 2000) (noting that observation in <u>Manning</u> was not dicta and that <u>Salerno</u> must be applied to show deference to legislatures). <u>But see</u>, <u>Greenville Women's Clinic</u> v. <u>Comm'r, S.C. Dept. of Health</u>, 317 F.3d 357, 359 (4th Cir. 2002) (on subsequent appeal, characterizing <u>Bryant</u> as holding, in part, that regulation in question "did not place an <u>undue burden</u> on a woman's decision whether to seek an abortion") (emphasis added).

1274 (1997); Planned Parenthood, Sioux Falls Clinic v. Miller, 63 F.3d 1452, 1456-58 (8th Cir. 1995) (opting to "follow what the Supreme Court actually did -- rather than what it failed to say -- and apply the undue-burden test."), cert. denied sub nom., Janklow v. Planned Parenthood, 517 U.S. 1174 (1996); cf. A Woman's Choice - E. Side Women's Clinic v. Newman, 305 F.3d 684, 687 (7th Cir. 2002) (reconciling conflict between Salerno, and Stenberg/Casey, by construing "no set of circumstances" language as a "suggestion" that gives way to Stenberg's holding that undue burden test applies), cert. denied, 537 U.S. 1192 (2003). We agree with these six circuit courts that the undue burden standard -- proposed as a standard "of general application" by the Casey plurality, Casey, 505 U.S. at 876, and twice applied to abortion regulations by a majority of the Court, id. at 895; Stenberg, 530 U.S. at 920 -- supersedes Salerno in the context of abortion regulation.

Complementing the general undue burden standard, the Supreme Court has also identified a specific and independent constitutional requirement that an abortion regulation must contain an exception for the preservation of a pregnant woman's health. See Stenberg, 530 U.S. at 929-30 (identifying "two independent reasons" for striking down a Nebraska regulation:  first, that it lacks a health exception, and second, that it imposes an undue burden on a woman's ability to choose abortion).  The origin of the health requirement can be traced to Roe, which held that "the

-10-

State, in promoting its interest in the potentiality of human life, may . . . regulate . . . abortion [after fetal viability] except where necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Roe v. Wade, 410 U.S. 113, 164-65 (1973)(emphasis added), reaff'd Casey, 505 U.S. at 879 (plurality opinion). Later, the majority in Casey observed that, had the medical emergency exception to Pennsylvania's abortion restrictions -- among them a parental consent requirement -- precluded "immediate abortion despite some significant health risks," it would have been unconstitutional since "the essential holding of Roe forbids a State to interfere with a woman's choice to undergo an abortion . . . if continuing her pregnancy would constitute a threat to her health." Casey, 505 U.S. at 880. Finally, in Stenberg, 530 U.S. at 930, the Supreme Court clarified that "the law requires a health exception in order to validate even a postviability abortion regulation, [and] it at a minimum requires the same in respect to previability regulations," 530 U.S. at 930. Thus, a statute regulating abortion must contain a health exception in order to survive constitutional challenge. Similarly, Roe requires that abortion regulations contain an adequate death exception to permit abortion when it is necessary to save the life of a pregnant woman. Roe, 410 U.S. at 164-65.

The instant case thus presents three questions: whether New Hampshire's Act contains an adequate health exception, whether it contains an adequate death exception, and whether it places an undue burden on unemancipated minors who wish to obtain an abortion. A state's decision to require parental notification for minors seeking an abortion is not constitutionally infirm per se. See Lambert v. Wicklund, 520 U.S. 292 (1997) (upholding parental notification statute against constitutional challenge to judicial bypass procedure). The district court determined, however, that the New Hampshire Act's lack of a health exception and overly narrow death exception render it unconstitutional. Appellees argue that the Act also creates an undue burden by failing to adequately ensure the confidentiality of judicial bypass procedures.

## A.  **Health exception**

The Attorney General and amici suggest that parental notification laws are shielded from the health exception requirement reiterated in Stenberg on account of the interests they aim to protect.[5] Parental notification laws are enacted not only

---

[5]  Amicus Bishop of Manchester argues that Stenberg should be limited to cases in which a particular method of abortion is banned outright. This argument misreads the Court's discussion of the regulation at issue in that case. The majority did emphasize its prior caselaw "invalidat[ing] statutes that in the process of regulating the methods of abortion, impose[] significant health risks," 530 U.S. at 931 (emphasis in original), but this language was meant to rebut Justice Thomas's dissent that a health exception was only applicable "where the pregnancy itself creates a threat to health." Id. (emphasis in original). To the contrary, the Court held, "a risk to a woman's health is the same whether it happens to

in furtherance of the state's "interest in the potentiality of human life," Roe, 410 U.S. at 164, but also in the interest of protecting minors from undertaking the risks of abortion without the advice and support of a parent.  In considering an abortion regulation based on interests other than the one identified in Roe, however, the Supreme Court has determined that it "cannot see how the interest-related differences could make any difference to the . . . application of the 'health' requirement." Stenberg, 530 U.S. at 931; see also Casey, 505 U.S. at 877 ("[A] statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." (emphasis added)) (plurality opinion).  The Constitution requires a health exception even when the State's interest in regulation is "compelling." See Roe, 410 U.S. at 163; see also Stenberg, 530 U.S. at 931 ("[A] State may promote but not endanger a woman's health when it regulates the methods of abortion.").  Thus, regardless of the interests served by New Hampshire's parental notice statute, it does not escape the Constitution's requirement of a health exception.

---

arise from regulating a particular method of abortion, or from barring abortion entirely." Id.  The risk is also the same when it arises from a minor's inability or unwillingness to notify her parents.  The need for a health exception arises from the potential for risk to a woman's health, not from the source of that risk.

The Attorney General and amici also argue that our decision should be controlled by Hodgson v. Minnesota, 497 U.S. 417 (1990), in which the Supreme Court upheld a parental notification statute that contained no health exception. However, as noted by the district court, the Hodgson Court did not consider a challenge to that statute's lack of a health exception,[6] and even if it had, the subsequent decisions in Casey and Stenberg would nevertheless require a health exception in the instant case. The additional cases cited by the Attorney General and amici as examples of parental notification or consent statutes upheld without a health

_____

[6] A review of the Hodgson briefs indicates only one instance in which the impact of the parental notification statute on minors in need of an abortion for health reasons is discussed. In response to Minnesota's cross-petition to appeal the Eighth Circuit's determination that a two-parent notice requirement was unconstitutional in the absence of a judicial bypass, Cross-Respondents discussed the lengths to which some minors would go to avoid having to notify a parent. This might include delaying or foregoing abortion even when "serious health problems . . . necessitate an immediate abortion." Brief for Cross-Respondents at 15, Minnesota v. Hodgson, 497 U.S. 417 (No. 88-1309). Such health problems, Cross-Respondents explained, were not covered by the statute's death exception. Id. at 15 n.29. There was no argument that the notice requirement was unconstitutional because it lacked a health exception for such circumstances; rather, Cross-Respondents argued that a judicial bypass provision was constitutionally required, in part so that a minor would not feel compelled to forego an abortion needed for health reasons in order to avoid notifying her parents. Cross-Petitioners responded that no evidence had been provided of circumstances in which health problems short of a threat to a minor's life would necessitate abortion. Reply Brief of Cross-Petitioners at 17-18, Minnesota v. Hodgson, 497 U.S. 417 (No. 88-1309). The Supreme Court addressed neither argument, although a majority did find the two-parent notice requirement unconstitutional in the absence of judicial bypass. Hodgson, 497 U.S. at 455.

exception are all similarly distinguishable. Only three times since <u>Roe</u> has the Supreme Court addressed a clear challenge to an abortion regulation's lack of a health exception. In all three, the Court has indicated that an exception must be provided when the restriction would place a woman's health at risk. See <u>Stenberg</u>, 530 U.S. at 930-38 (requiring health exception for "partial-birth abortion" ban); <u>Casey</u>, 505 U.S. at 879-80 (reading medical emergency exception to include threat to health); <u>Thornburgh</u> v. <u>Am. Coll. of Obstetricians and Gynecologists</u>, 476 U.S. 747, 768-71 (1986) (finding statute requiring presence of second physician for post-viability abortion facially invalid for lack of medical emergency exception), <u>overruled</u> on other grounds, <u>Casey</u>, 505 U.S. at 882.

Since <u>Stenberg</u>, at least two circuit courts have applied the health exception requirement to parental notice or consent laws. In <u>Planned Parenthood of the Rocky Mountains Services, Corp.</u> v. <u>Owens</u>, 287 F.3d 910, 915-16 (10th Cir. 2002), the Tenth Circuit held that, because circumstances existed in which a pregnancy complication could seriously threaten a pregnant minor's health, a Colorado parental notification law similar to the New Hampshire Act was facially invalid for lack of a health exception. Similarly, the Ninth Circuit recently struck down an Idaho parental consent statute, finding that "[a] health exception is as requisite in statutory or regulatory provisions affecting only minors' access to

-15-

abortion as it is in regulations concerning adult women." <u>Planned Parenthood of Idaho, Inc.</u> v. <u>Wasden</u>, 376 F.3d 908, 922-24 (9th Cir. 2004) (finding Idaho statute's health exception overly narrow). We agree, and therefore affirm the district court's holding that the New Hampshire Act is constitutionally invalid in the absence of a health exception.

Acknowledging that the Act contains no explicit health exception, the Attorney General argues that other provisions of New Hampshire law provide a functional equivalent. None of the proffered statutes, however, is adequate. RSA 153-A:18 precludes civil liability for health professionals who render emergency medical care without consent, but it does not preclude criminal liability. RSA 676:6, VII(b) permits physicians and their assistants to use force in providing emergency medical care when no one competent to consent to such care is available. While RSA 676:6, VII(b) may preclude criminal liability for assault, it would not insulate a physician from criminal liability for violating the Act's notification provisions. <u>See</u> RSA 132:27 (providing that violation of the Act's notice requirement is a misdemeanor). Moreover, the proffered statutes insulate medical personnel from civil liability or assault charges that arise from giving treatment without <u>consent</u>; they do not provide such protection when the legal action arises from giving treatment to a consenting minor without first providing forty-eight hours' notice to her parent.

-16-

For the first time, in this appeal, the Attorney General also cites RSA 627:3, I, which codifies the "competing harms" defense to criminal liability for those who violate the law in order to avoid harm that "outweigh[s], according to ordinary standards of reasonableness, the harm sought to be prevented" by the criminal provision. Although this provision has the potential to protect against criminal liability under the Act, it cannot preclude civil liability. Moreover, the provision would leave providers uncertain whether, in any given circumstance, providing an abortion in violation of the Act would meet the "ordinary standards of reasonableness."

Even if these statutes could be cobbled together to preclude all civil and criminal liability for medical personnel who violate the Act's notice requirements in order to preserve a minor's health, we would not view them as equivalent to the constitutionally required health exception. The basic canons of statutory construction in New Hampshire require us to look first to a statute's plain meaning, and when it is clear and unambiguous, to apply the statute as written. <u>See</u>, <u>e.g.</u>, <u>Appeal of Astro Spectacular, Inc.</u>, 639 A.2d 249, 250 (N.H. 1996). The Act clearly states that "[n]o abortion shall be performed upon an unemancipated minor . . . until at least 48 hours after written notice" to a parent. RSA 132:25. Three explicit exceptions to this rule are provided: (1) when abortion is necessary to prevent the minor's

death; (2) when a parent certifies in writing that he or she has been notified; and (3) when a court grants a judicial bypass.  RSA 132:26, I, II.   The New Hampshire legislature's intent that abortions not in compliance with the Act's notification provisions be prohibited in all but these three circumstances is clear.  See St. Joseph Hosp. of Nashua v. Rizzo, 676 A.2d 98, 100 (N.H. 1996) (espousing expressio unius standard of statutory construction). The earlier-enacted statutory provisions cited by the Attorney General cannot be read to supercede this intent.  See Petition of Dunlap, 604 A.2d 945, 955 (N.H. 1992) ("'When a conflict exists between two statutes, the later statute will control, especially when the later statute deals with a subject in a specific way and the earlier enactment treats the subject in a general fashion.'" (quoting Bd. of Selectmen v. Planning Bd., 383 A.2d 1122, 1124 (N.H. 1978)).

Finally, the Attorney General argues that the Act's judicial bypass mechanism allows prompt authorization of a health-related abortion without notice.  The Act provides that such proceedings "shall be given such precedence over other pending matters so that the court may reach a decision promptly and without delay," provides minors 24-hour, 7-day access to the courts, and provides for expedited appeal.  RSA 132:26, II(b)-(c).  However, the Act allows courts seven calendar days in which to rule on minors' petitions, and another seven calendar days on appeal.

-18-

Delays of up to two weeks can therefore occur, during which time a minor's health may be adversely affected.  Even when the courts act as expeditiously as possible, those minors who need an immediate abortion to protect their health are at risk.  Due to this delay, the Act's bypass provision does not stand in for the constitutionally required health exception.  See Thornburgh, 476 U.S. at 768-71 (finding statute facially invalid for failing to provide health exception to delay caused by awaiting presence of second physician).

The New Hampshire Act contains no explicit health exception, and no health exception is implied by other provisions of New Hampshire law or by the Act's judicial bypass procedure. Thus, the Act is facially unconstitutional.

### B.  Death exception

Just as it requires a health exception, the Constitution also requires an exception to abortion restrictions when the life of a pregnant woman is in danger.  Stenberg, 530 U.S. at 931 ("[T]he governing standard requires an exception 'where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother.'" (quoting Casey, 505 U.S. at 879)).  Accordingly, the New Hampshire Act waives its parental notice requirement when a physician can certify that abortion is "necessary to prevent the minor's death and there is insufficient time to provide the required notice."  RSA 132:26, I(a).  Appellees

argue that this death exception is unconstitutionally narrow because (1) it is not possible for a physician to determine with any certainty whether death will occur before the notice provisions could be complied with; (2) it does not allow for circumstances in which abortion is the best, but not the only, option for saving a minor's life;[7] and (3) it does not permit abortion providers to rely on their own good faith judgment about whether an abortion is necessary. The Attorney General does not refute these charges, but responds that the Act is sufficiently specific to give notice of prohibited conduct, and that a scienter requirement can be read into the Act from New Hampshire law.

A minimum of forty-eight hours is necessary for compliance with the Act's notification requirement. RSA 132:25, I. Dr. Wayne Goldner, a named plaintiff in this case, provided unopposed testimony that physicians cannot predict with adequate precision what course medical complications will take, and thus cannot always determine whether death will occur within this time

---

[7] The plaintiffs correctly identify that the Act, as currently formulated, would require a physician to use procedures that pose more risk to her patient's health in order to comply with the necessity provision of the death exception. See Colautti v. Franklin, 439 U.S. 379, 400 (1979) ("[T]he word 'necessary' suggests that a particular technique must be indispensable to the woman's life or health -- not merely desirable -- before it may be adopted."). Because we have already found unconstitutional the Act's failure to provide a health exception -- which would remedy this problem by permitting abortion even in cases where a minor's death could be avoided by other, riskier means -- we do not address this flaw as a separate ground for constitutional challenge.

window. Consequently, the time component of the Act's death exception forces physicians either to gamble with their patients' lives in hopes of complying with the notice requirement before a minor's death becomes inevitable, or to risk criminal and civil liability by providing an abortion without parental notice. See Declaration of Wayne Goldner, M.D., at ¶ 17 ("[T]he Act will force me to choose between following the law and letting my patient's condition deteriorate, possibly past the point of being able to save her life at all, and alternatively providing appropriate medical care to my patient and risking criminal prosecution and being sued by her parents."). The threat of such sanctions will have a "profound chilling effect on the willingness of physicians to perform abortions" when a minor's life is at risk. Colautti, 439 U.S. at 396. Thus, the Act's death exception is drawn too narrowly to protect minors in need of a life-saving abortion.

The Attorney General apparently concedes that an abortion provider must be able to rely on his or her good faith medical judgment in determining whether her patient's life is in danger. See Colautti, 439 U.S. at 395 ("We need not now decide whether, under a properly drafted statute, a finding of bad faith or some other type of scienter would be required before a physician could be held criminally responsible for an erroneous determination of viability. We reaffirm, however, that 'the determination of whether a particular fetus is viable is, and must be, a matter for

-21-

the judgment of the responsible attending physician.'"). The Attorney General argues that RSA 626:2, I, which states that "[a] person is guilty of a . . . misdemeanor only if he acts purposely, knowingly, recklessly or negligently, as the law may require, with respect to each element of the offense," can be read together with the Act to provide the necessary scienter requirement. According to the Supreme Court of New Hampshire, "[w]here a specific mental state is not provided for the offense," RSA 626:2, I(a) requires "proof of a culpable mental state which is appropriate in light of the nature of the offense and the policy considerations for punishing the conduct in question." State v. Bergen, 677 A.2d 145, 146 (N.H. 1996) (determining requisite mental state for indecent exposure). It is not clear, however, which of the four scienter requirements would be imposed in this circumstance. The definition of negligence imposes an objective reasonableness standard, see RSA 626:2, II (d), thus, a physician who acts on a good faith belief that abortion is necessary to save a patient's life could nonetheless face criminal or civil liability if a judge or jury later found that the physician's assessment was unreasonable. See Voinovich, 130 F.3d at 205 ("In this area [of medical necessity] where there is such disagreement, it is unlikely that the prosecution could not find a physician willing to testify that the physician did not act reasonably.").

As the district court held, we cannot construe the Act to preclude liability for good faith judgments "unless such a construction is reasonable and readily apparent." Heed, 296 F. Supp. 2d at 66-67 (quoting Stenberg, 530 U.S. at 944). The Act gives no indication that the negligence standard set out in RSA 626:2, I should not be applied. Thus, a physician cannot know whether his or her determination that a minor's life is at risk will be judged according to a standard (e.g., knowingly) that respects her good-faith medical assessment, or by an objective standard (negligently) that would leave the physician's judgment open to post hoc second guessing. The resulting uncertainty would, again, impermissibly chill physicians' willingness and ability to provide lifesaving abortions. See Voinovich, 130 F.3d at 205 (finding medical emergency exception unconstitutionally vague "because physicians cannot know the standard under which their conduct will ultimately be judged"). As Dr. Goldner explained, "the Act forces doctors to think about criminal prosecution at a time when we need to be concentrating on doing what is best for our patients, thus creating unnecessary risk to patients' health and lives." Declaration of Wayne Goldner, M.D., at ¶ 19. That risk constitutes an undue burden for minors in need of life-saving abortions.

Because its time requirement is drawn too narrowly, and because it fails to safeguard a physician's good-faith medical

-23-

judgment that a minor's life is at risk against criminal and civil liability, the Act's death exception is unconstitutional.

## C. **Confidentiality**

The Act provides for judicial bypass of its notice provisions if, after a hearing, a judge "determines that the pregnant minor is mature and capable of giving informed consent to the proposed abortion," or, if she is not capable of giving informed consent, that "the performance of an abortion upon her without notification of her parent, guardian, or conservator would be in her best interests." RSA 132:26, II; cf. Bellotti v. Baird, 443 U.S. 622, 643-44 (1979) (requiring parental consent laws to provide for judicial bypass on same grounds). Appellees argue that the Act does not adequately provide for the confidentiality of these judicial bypass procedures. The Act indicates that "[p]roceedings in the court . . . shall be confidential," and "[a]n expedited confidential appeal shall be available." RSA 132:26, II(b)-(c).

Inadequate confidentiality provisions "raise the specter of public exposure and harassment of women who choose to exercise their personal, intensely private, right, with their physician, to end a pregnancy." Thornburgh, 476 U.S. at 767; see also Bellotti v. Baird, 443 U.S. 622, 644 (1979) (finding that judicial bypass proceeding "must assure that a resolution of the issue, and any appeals that follow, will be completed with anonymity"). In the instant case, a lack of confidentiality would also create a significant risk that a minor's parents could learn of her

-25-

pregnancy and desire for an abortion, resulting in the very harms sought to be avoided by the bypass procedure. Alternatively, a minor might be compelled to delay or decline to seek an abortion out of fear that her parents would find out. Thus, for a large fraction of minors eligible for judicial bypass, inadequate confidentiality would impose an undue burden.

Confidentiality provisions must "take reasonable steps to prevent the public from learning of the minor's identity," but the Supreme Court has "refuse[d] to base a decision on the facial validity of a statute on the mere possibility of unauthorized, illegal disclosure by state employees." Akron Ctr., 497 U.S. at 513. Considerable grey area is left between these two standards. Because we have already found the Act in its entirety unconstitutional on other grounds, however, we find it unnecessary to delve further into an evaluation of its confidentiality provisions.

### III. Conclusion

For the reasons stated above, we affirm the district court's order declaring the Act unconstitutional and enjoining its enforcement.

**Affirmed**.