Affirmed by published opinion. Judge MICHAEL wrote the majority opinion, in which Judge MOTZ joined. Judge NIEMEYER wrote a dissenting opinion.
OPINION
MICHAEL, Circuit Judge.
This case involves a facial challenge under the Fourteenth Amendment to a Virginia statute that attempts to criminalize “partial birth abortion,” which the statute terms “partial birth infanticide.” In a summary judgment order the district court declared the statute invalid for several reasons. We affirm because it lacks an exception to protect a woman’s health.
I.
A.
Chapters 961 and 963 of the 2003 Acts of the Virginia General Assembly (“the Act”) make it a Class 4 felony for a person to knowingly perform “partial birth infanticide.” Va.Code Ann. § 18.2-71.1. A Class 4 felony in Virginia is punishable by a prison term of up to ten years and a fine of up to $100,000. Id. § 18.2-10. The Act defines “partial birth infanticide” as
any deliberate act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed.
Id. § 18.2-71.1(B). The phrase “human infant who has been born alive” is defined as
a product of human conception that has been completely or substantially expelled or extracted from its mother, regardless of the duration of pregnancy, which after such expulsion or extraction breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.
Id. § 18.2-71.1(0). The Act defines the phrase “substantially expelled or extracted from [the] mother” as (i) when “the infant’s entire head is outside the body of the mother” in the case of a headfirst presentation, or (ii) when “any part of the infant’s trunk past the navel is outside the body of the mother” in the case of a breech presentation. Id. § 18.2-71.1(D). The Act provides the following exception to the general prohibition:
This section shall not prohibit the use by a physician of any procedure that, in reasonable medical judgment, is necessary to prevent the death of the mother, so long as the physician takes every medically reasonable step, consistent with such' procedure, to preserve the life and health of the infant. A procedure shall not be deemed necessary to prevent the death of the mother if completing the delivery of the living infant would prevent the death of the mother.
Id. § 18.2-71.1(E). The Act’s ban of certain abortion procedures does not provide an exception for instances in which an *621 otherwise banned procedure is necessary, in appropriate medical judgment, to preserve a woman’s health. Indeed, the Virginia General Assembly rejected proposed amendments that would have provided a statutory exception for some circumstances when a woman’s health was at risk. See Richmond Med. Ctr. v. Hicks, 301 F.Supp.2d 499, 502 (E.D.Va.2004). The General Assembly failed to include a health exception even 'though an earlier Virginia statute banning late-term abortions was struck down because it lacked an exception for instances when continuation of a pregnancy poses a threat to a woman’s health. See Richmond Med. Ctr. for Women v. Gilmore, 224 F.3d 337, 339 (4th Cir.2000). The Virginia House of Delegates also rejected proposed amendments that would have limited the Act’s prohibition to postviability abortions. See Hicks, 301 F.Supp.2d at 502.
The Act challenged in this case excludes the following from the definition of “partial birth infanticide”:
(i) the suction curettage abortion procedure, (ii) the suction aspiration abortion procedure, (iii) the dilation and evacuation [ (D & E) ] abortion procedure involving dismemberment [ (disarticulation) ] of the fetus prior to removal from the body of the mother, [and] (iv) completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.
Va.Code Ann. § 18.2-71.1(B). By excepting only a single variant of the D & E procedure, that involving fetal disarticulation prior to removal from the woman’s body, the Act prohibits all other D & E variations meeting the statutory definition of “partial birth infanticide.” One prohibited variant is the intact D & E, which does not involve disarticulation and in which the fetus is removed from the uterus through the cervix in one pass rather than several. Depending on the presentation of the fetus, an intact D & E proceeds in one of two ways. In the case of a vertex presentation, the physician collapses the fetal calvarium and then extracts the entire fetus through the cervix. In the case of a breech presentation, the physician pulls the fetal trunk through the cervix, collapses the fetal calvarium, and then completes extraction of the fetus through the cervix. A second variation prohibited by the Act is the dilation and extraction (D & X) procedure, which is similar to the breech extraction variant of the intact D & E in all material respects except that it involves the intentional repositioning of the fetus to a breech presentation. Because the intact D & E and D & X procedures are so similar, they are often referred to interchangeably.. A third variation.prohibited by the Act involves the D & E in which fetal disarticulation occurs outside of the woman’s body. Disarticulation generally occurs beyond the cervical os (the lower portion, or opening, of the cervix) as a result of traction against the cervix. However,-disarticulation may occur outside of the woman’s body when there is little or no space between the cervical os and the vaginal introitus (the vaginal- canal) or when the cervical os prolapses (emerges) outside the vaginal introitus. (The Act also criminalizes the treatment of certain incomplete miscarriages.)
Plaintiff William G. Fitzhugh, M.D. is a board certified obstetrician and gynecologist who is licensed to practice medicine in Virginia. Dr. Fitzhugh performs abortions through twenty weeks of pregnancy; he therefore does not perform any postviability abortions. Some of the abortions he performs, particularly intact D & Es and D & Es in which fetal disarticulation occurs outside of the woman’s body, are prohibited by the Act. Dr. Fitzhugh performs some of these abortions on the premises of plaintiff Richmond Medical Center for *622 Women (RMCW) where he is Medical Director.
B.
The Act was scheduled to take effect on July 1, 2003. On June 18, 2003, RMCW and Dr. Fitzhugh filed a complaint against two Commonwealth’s Attorneys (“the Commonwealth”) in the United States District Court for the Eastern District of Virginia, challenging the Act’s constitutionality and seeking declaratory and injunc-tive relief to block its enforcement. The court granted the plaintiffs’ motion for a preliminary injunction against enforcement of the Act on July 1, 2003. After the parties engaged in discovery, the plaintiffs filed a motion for summary judgment on September 25, 2003. On February 4, 2004, the district court granted summary judgment to the plaintiffs, declaring the Act unconstitutional and permanently enjoining its enforcement. See Hicks, 301 F.Supp.2d at 517-18. The court held the Act facially invalid under the Fourteenth Amendment for several independent reasons: (1) it lacks an exception to protect a woman’s health, (2) it places an undue burden on a woman’s right to decide to have an abortion, (3) its life exception is inadequate, (4) it bans — in the absence of a compelling state interest — other safe gynecological procedures such as those used in certain miscarriage presentations, and (5) it is unconstitutionally vague. Id. at 513-17. In its order awarding summary judgment, the district court struck certain evidence proffered by the Commonwealth, specifically, the complete testimony of one expert, selected testimony of another expert, and several exhibits and other documents. The Commonwealth appeals.
II.
The Commonwealth argues that the district court erred when it granted summary judgment to the plaintiffs on the ground that the Act is unconstitutional because it lacks an exception for the preservation of a woman’s health. Summary judgment “shall be rendered forthwith” when the proffered evidence “show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Fed. R.Civ.P. 56(c). We conclude that the judgment of the district court must be affirmed because “the [Supreme] Court ... unequivocally held [in Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) ] that any ban on partial-birth abortion must include an exception for the health of the mother in order to be constitutional.” Richmond Med. Ctr. for Women v. Gilmore, 219 F.3d 376, 377 (4th Cir.2000) (Luttig, J., concurring).
In Carhart the Court concluded that Nebraska’s statutory ban on certain abortion procedures, including the intact D & E/D & X procedure, violated the federal Constitution for “at least two independent reasons.” 530 U.S. at 930, 120 S.Ct. 2597. The statute (1) imposed “an undue burden on a woman’s ability to choose a D & E abortion, thereby unduly burdening the right to choose abortion itself’ and (2) lacked “any exception for the preservation of the ... health of the mother.” Id. (internal quotation marks omitted). Thus, the lack of a health exception alone provides a sufficient basis for invalidating restrictions on a woman’s right to have an abortion. The Carhart opinion explained that “the governing standard requires an exception ‘where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother,’ for this Court has made clear that a State may promote but not endanger a woman’s health when it regulates the methods of abortion.” Id. at 931 120 S.Ct. 2597 (quoting Planned Parenthood v. Casey, 505 U.S. 833, 879, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). Thus, a state cannot force *623 women to use methods of abortion that present greater risks to their health than other available methods, see id., regardless of whether the fetus has reached viability, see id. at 930, 120 S.Ct. 2597 (“Since the law requires a health exception in order to validate even a postviability abortion regulation, it at a minimum requires the same in respect to previability regulation.”)-.
The State of Nebraska contended in Carhart that the intact D & E/D & X abortion procedure could be outlawed and that no health exception was necessary. The Supreme Court disagreed after conducting a wide-ranging review of medical authority evaluating the intact D & E/D & X procedure. In the course of its review, the Court supplemented the district court record with information from a significant array of medical sources. Extra-record sources considered by the Court included medical textbooks and journals relating to abortion, obstetrics, and gynecology; the factual records developed in prior “partial birth abortion” cases; and amicus briefs (with citations to. medical authority) submitted on behalf of medical organizations. See id. at 923-29, 932-36, 120 S.Ct. 2597.
Based on all of the information available, the Court concluded that substantial medical authority supports the proposition that the intact D & E/D & X procedure offers significant health and safety advantages over alternative methods of late-term abortion. First (and most important), the intact D & E/D &. X procedure permits the fetus, to pass through the cervix in one pass rather than several. Id. at 927, 120 S.Ct. 2597. It therefore reduces operating time, blood loss, trauma, exposure to anesthesia, and the risk of infection; it also reduces the risk of (1) instrument-inflicted damage to the uterus and cervix and (2) injury from sharp fetal bone fragments. Id. at 932, 936, 120 S.Ct. 2597. Second, the procedure prevents the most common causes of maternal mortality (disseminated intravascular coagulation and amniotic fluid embolus), eliminates the possibility of serious complications arising from retained fetal tissue, and eliminates the risk of embolism of cerebral tissue into the woman’s blood stream. Id. at 932, 935, 120 S.Ct. 2597. Third, it reduces the risk of cervical injury in circumstances involving nonviable fetuses, such as fetuses with hydrocephaly, because reduction of the fetal calvarium allows a smaller diameter to pass through the woman’s cervix. Id. at 929, 120 S.Ct. 2597. Fourth, the intact D & E/D & X procedure can mitigate the special risks faced by women with prior uterine scars or for whom abortion by induction would be especially dangerous. Id. These factors led tüe Court to hold that any statute prohibiting the intact D & E/D & X procedure necessarily “creates a significant health risk” because “substantial medical authority” confirms .the procedure’s utility in safeguarding women’s health. Id. at 938, 120 S.Ct. 2597. Any such statute “must [therefore] contain a health exception.” Id. The fact that the Nebraska statute — like the Act here — contained an exception to protect a woman’s life had no bearing on the Court’s holding that a freestanding health exception is constitutionally required. See id. at 921-22, 120 S.Ct. 2597.
The dissent argues that the differences between the Act and the Nebraska statute are sufficient to exempt the Act from Car-hart’s holding. See post at 629-31, 638-39. This argument fails because the two laws have key similarities. To begin with, the Nebraska law, like the Act, applied previability as well as postviability. Car-hart makes clear that this “aggravates the constitutional problem presented” because a state’s “interest in regulating abortion previability is considerably weaker than postviability.” 530 U.S. at 930, 120 S.Ct. 2597. (Again, Dr. Fitzhugh performs only previability abortions.) In addition, the *624 Act criminalizes some of the same medical procedures (specifically, intact D & E/D & Xs) that Nebraska had criminalized, and these same procedures were the focus of the Court’s attention in Carhart. Admittedly, Nebraska’s law was broader in scope than the one we consider here: the Nebraska law was read to prohibit both D & Es by disarticulation and intact D & E/D & Xs, see id. at 938, 120 S.Ct. 2597, whereas the Act purports to except the former from its reach, see Va.Code Ann. § 18.2-71.1(B). In any event, the Carhart Court’s analysis of the health exception requirement dealt exclusively with its application to the intact D & E/D & X procedure. See 530 U.S. at 930-38, 120 S.Ct. 2597. Car-hart thus applied the health exception requirement to only a subcategory of the total conduct proscribed by the Nebraska statute. Specifically, the Court addressed the question of whether a health exception was constitutionally required in the context of Nebraska’s attempt to criminalize the intact D & E/D & X procedure. Justice O’Connor highlighted the Court’s focus by explaining that if a statute “limited its application to the [intact D & E/]D & X procedure and included an exception for the ... health of the mother, the question presented would be quite different.” Id. at 950, 120 S.Ct. 2597 (O’Connor, J., concurring) (emphasis added); see also id. at 948, 120 S.Ct. 2597 (O’Connor, J., concurring) (explaining that “[t]his lack of a health exception necessarily renders the statute unconstitutional”).
Indeed, it is not disputed in this case that the Act — like the Nebraska statute in Carhart — prohibits the intact D & E/D & X procedure. See Reply Br. of Appellants at 2 (explaining that the Act “does not allow the D & X procedure, or what is sometimes referred to as an ‘intact D & E’ ”); id. at 3 (identifying “[t]he central issue in this case” as “whether [Virginia] may prevent use of the D & X or intact D & E” procedure). In the course of this medical procedure the fetus will often be “substantially expelled or extracted” from the woman’s body, and the fetus will often show some “evidence of life” at the time the physician commits a “deliberate act” that is “intended to” and “does” terminate the pregnancy. Va.Code Ann. § 18.2-71.1(B),- (C), (D). The dissent gets nowhere by contending that “[i]t is the killing of the fetus, not the abortion procedure,” that is outlawed by the Act. Post at 631; see also post at 645 n. 5 (arguing that “[t]he Nebraska statute found unconstitutional in Carhart ... differs materially from the Virginia statute” because “the former proscribed certain abortion procedures while the latter bans only the destruction of living fetuses”). Whatever else the Act might criminalize, it most certainly criminalizes the intact D & E/D & X procedure. As the Carhart Court explained (and as we note in part I), the fetal calvarium (or skull) is collapsed during the intact D & E/D & X procedure, 530 U.S. at 927-28, 120 S.Ct. 2597, and during this procedure, which results in the demise of the fetus, the fetus may not be “completely extracted or expelled” from the woman’s body, Va.Code Ann. § 18.2-71.1(B). Dr. Fitzhugh performs this very procedure, which would violate the Act, as the dissent acknowledges. See post at 636-38.
It is also undisputed that the Act makes no provision for those situations in which the intact D &. E/D & X procedure “is necessary, in appropriate medical judgment, for the preservation of the ... health of the mother.” Casey, 505 U.S. at 879, 112 S.Ct. 2791 (internal quotation marks omitted). This alone is enough to affirm the district court’s judgment invalidating the Act because, again, any statute prohibiting the intact D & E/D & X procedure necessarily “creates a significant health risk” and therefore “must contain a health exception.” Carhart, 530 U.S. at 938, 120 S.Ct. 2597.
*625 The Commonwealth argues that summary judgment was improper because the plaintiffs did not present substantial medical authority for the proposition that a health exception is needed in this particular statute. The district court concluded otherwise, but that is beside the point. For Carhart established the health exception requirement as a per se constitutional rule. This rule is based on substantial medical authority (from a broad array of sources) recognized by the Supreme Court, and this body of medical authority does not have to be reproduced in every subsequent challenge to a “partial birth abortion” statute lacking a health exception.[1] See, e.g., Planned Parenthood v. *626 Heed, 390 F.3d 53, 59 (1st Cir.2004) (explaining that even a parental notification statute “must contain a health exception in order to survive constitutional challenge”), cert. granted sub nom. Ayotte v. Planned Parenthood, — U.S. -, 125 S.Ct. 2294, — L.Ed.2d - (2005); Planned Parenthood v. Wasden, 376 F.3d 908, 922 (9th Cir.2004) (characterizing health exception as “a per se constitutional requirement”), cert. denied, - U.S. -, 125 S.Ct. 1694, 161 L.Ed.2d 524 (Mar. 28, 2005); Women’s Med. Prof'l Corp. v. Taft, 353 F.3d 436, 444-45 (6th Cir.2003) (explaining that Casey and Carhart require a health exception); A Woman’s Choice-E. Side Women’s Clinic v. Newman, 305 F.3d 684, 688 (7th Cir.2002) (noting that Carhart Court was “of the view ... that [the] constitutionality [of laws regulating abortion] must be assessed at the level of legislative fact, rather than adjudicative fact determined by more than 650 district judges. Only treating the matter as one of legislative fact produces the nationally uniform approach that [Carhart ] demands.”); Planned Parenthood v. Owens, 287 F.3d 910, 918 (10th Cir.2002) (explaining that Carhart requires “state abortion regulations [to] provide an exception for the protection of the health of pregnant women”); Reproductive Health Servs. of Planned Parenthood v. Nixon, 325 F.Supp.2d 991, 994-95 (W.D.Mo.2004) (invalidating “partial birth abortion” statute “[b]ecause there are no genuine issues of material fact as to the presence of a health exception, [which requires the] Court, pursuant to Stenberg v. Carhart, [to] conclude that the [statute] is unconstitutional”); Planned Parenthood Fed’n of Am. v. Ashcroft, 320 F.Supp.2d 957, 1013 (N.D.Cal.2004) (noting that Carhart dispels characterization of the health exception inquiry “as one of pure fact, limited to the record in [the] particular case”); WomanCare, P.C. v. Granholm, 143 F.Supp.2d 849, 855 (E.D.Mich.2001) (invalidating “partial birth abortion” statute because “there are no genuine issues of material fact, with respect to the lack of a health exception in the statute” and because the Supreme Court’s decision in Carhart is “controlling”); Summit Med. Assocs. v. Siegelman, 130 F.Supp.2d. 1307, 1309, 1314 (M.D.Ala.2001) (invalidating “partial birth abortion” statute “on the pleadings” and concluding that it was unconstitutional under Carhart “[f|or its lack of a health-exception alone”); Daniel v. Underwood, 102 F.Supp.2d 680, 681, 684 (S.D.W.Va.2000) (concluding that the state’s “ban on ‘partial-birth abortion’ fails to provide an exception for the preservation of the health of the woman and therefore violates the United States Constitution” and explaining that Carhart “compels th[is] conclusion”).
In sum, Carhart has already established, based on substantial medical authority, that a statute prohibiting the intact D- & E/D & X abortion procedure necessarily “creates a significant health risk” and “must [therefore] contain a health exception.” 530 U.S. at 938, 120 S.Ct. 2597. Because the Act lacks a health exception, it is unconstitutional on its face.
III.
The Commonwealth also argues that the district court erred in failing to *627 apply the proper standard for reviewing facial challenges alleging overbreadth. According to the Commonwealth, the court should have applied the standard set forth in United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). There, the Supreme Court said that “[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.” Id. at 745, 107 S.Ct. 2095. The plaintiffs counter that the proper approach is that used by the Supreme Court in Carhart, where the Court — without applying Salerno ’s “no set of circumstances” test — held that the Nebraska statute banning certain abortion procedures was unconstitutional on its face because it lacked a health exception. See Carhart, 530 U.S. at 930-38, 120 S.Ct. 2597. We conclude, for the following reasons, that Salerno does not govern a facial challenge to a statute regulating abortion.
First, in Carhart the Supreme Court “without so much as a mention of Salerno ... held invalid, in a pre-enforcement challenge, an abortion statute that might ... have [had] at least some [constitutional] applications.” Newman, 305 F.3d at 687. Earlier, the Court in Casey had similarly disregarded Salerno. As a result, seven circuits have concluded that Salerno does not govern facial challenges to abortion regulations. See Heed, 390 F.3d at 58-59; Newman, 305 F.3d at 687; Planned Parenthood v. Farmer, 220 F.3d 127, 142 (3d Cir.2000); Planned Parenthood v. Lawall, 180 F.3d 1022, 1027 (9th Cir.1999), amended by 193 F.3d 1042 (1999); Women’s Med. Prof'l Corp. v. Voinovich, 130 F.3d 187, 193 (6th Cir.1997); Jane L. v. Bangerter, 102 F.3d 1112, 1116 (10th Cir.1996); Planned Parenthood v. Miller, 63 F.3d 1452, 1458 (8th Cir.1995). Only the Fifth Circuit has suggested otherwise, but even that circuit’s cases are inconsistent. Compare Sojourner T v. Edwards, 974 F.2d 27, 30 (5th Cir.1992) (applying Casey’s undue burden test without reference to Salerno), with Barnes v. Moore, 970 F.2d 12, 14 & n. 2 (5th Cir.1992) (per curiam) (applying Salerno to a facial attack on an abortion regulation).
Second, contrary to the Commonwealth’s suggestion, the question of Salerno ’s applicability in the abortion context has not been squarely confronted by this court. The Commonwealth claims that in Manning v. Hunt, 119 F.3d 254 (4th Cir.1997), we “ruled that Salerno survived Casey.” Br. of Appellants at 15. The parties in Manning, however, had not asked us “to decide that the District Court improperly applied the Salerno standard for review of facial challenges,” and we therefore concluded that the issue was not properly before us. Manning, 119 F.3d at 268 n. 4. Moreover, in Planned Parenthood v. Camblos, 155 F.3d 352, 359 n. 1 (4th Cir.1998) (en banc), our full court specifically declined to decide whether to apply Salerno to statutes regulating abortion. There, we characterized “Manning [’s suggestion] that the Salerno standard remains the governing standard until the Supreme Court explicitly holds otherwise” as “dicta.” Id. at 381 n. 14. Later, in Greenville Women’s Clinic v. Bryant, 222 F.3d 157 (4th Cir.2000) (Greenville I), we again declined to resolve the question, holding that various aspects of a South Carolina regulation establishing standards for licensing abortion clinics were constitutional under either the Casey or Salerno standard for reviewing a facial challenge. See id. at 165 (concluding that the regulation at issue survived “[e]ven when we apply [the standard from Casey,] a less deferential standard than that articulated in Salerno ”). In Greenville Women’s Clinic v. Commissioner, 317 F.3d 357 (4th Cir.2002) (Greenville II), we addressed further aspects of the facial challenge to the South Carolina *628 abortion clinic licensing standards. We used the Salerno test there, but only in the context of reviewing a claim that the regulatory scheme allowed for the standardless delegation of medical licensing authority to third parties in violation of Yick Wo v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886). See Greenville II, 317 F.3d at 361-63; id. at 372 & n. 4 (King, J., dissenting).
Third, the recent case of Sabri v. United States, 541 U.S. 600, 124 S.Ct. 1941, 1948-49, 158 L.Ed.2d 891 (2004), puts the issue to rest by recognizing the appropriateness of facial challenges alleging over-breadth in the regulation of abortion. In Sabri the Supreme Court recognized that facial attacks are appropriate in only “limited settings” that include challenges to laws restricting abortion. Id. at 1949. In rejecting a criminal defendant’s facial challenge to a federal bribery statute, the Court noted that facial challenges are to be discouraged because “they invite judgments on fact-poor records” and “call for relaxing familiar requirements of standing.” Id. at 1948. Nevertheless, the Court stated that it had “recognized the validity of facial attacks alleging over-breadth ... in relatively few settings,” and these include challenges to abortion regulations. Id. (citing Carhart). Thus, Sabri makes clear that Salerno’s “no set of circumstances” standard does not apply in the context of a facial challenge, like the one here, to a statute regulating a woman’s access to abortion.
IV.
As Justice O’Connor has said, “[t]he issue of abortion is one of the most contentious and controversial in contemporary American society. It presents extraordinarily difficult questions that ... involve ‘virtually irreconcilable points of view.’ ” Carhart, 530 U.S. at 947, 120 S.Ct. 2597 (O’Connor, J., concurring) (quoting opinion of the Court, id. at 921, 120 S.Ct. 2597). These questions are difficult and sensitive to be sure, but that does not give the dissent free license to accuse us of “tarring [liberty] with the color of political ideology,” post at 645, “asserting] vacuously that we are doing what the Supreme Court commands,” post at 645, deciding this case based on “personal convenience,” post at 646, disregarding “the mind’s sense of right,” post at 645-46, and “disconnecting our law from accepted moral norms,” post at 645. No matter what the dissent says, the simple truth is that we affirm the district court’s order striking down the Act for a single reason: the “lack of a health exception necessarily renders the [Act] unconstitutional.” Carhart, 530 U.S. at 948, 120 S.Ct. 2597 (O’Connor, J., concurring).
A woman’s interest in protecting her health is at the core of her “constitutional liberty ... to have some freedom to terminate her pregnancy.” Casey, 505 U.S. at 869, 112 S.Ct. 2791. This enduring principle — which the dissent either ignores or minimizes — was recognized in Roe v. Wade, the case in which the Supreme Court struck down a Texas abortion statute “that except[ed] from criminality only a life-saving procedure on behalf of the mother.” 410 U.S. 113, 164, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). The Roe opinion also recognized that a state has an “interest in the potentiality of human life.” Id. But even when this interest is at its highest point (subsequent to viability), a state may regulate or proscribe abortion only if it provides an exception for instances “where it is necessary, in appropriate medical judgment, for the preservation of the ... health of the mother.” Id. at 165, 93 S.Ct. 705. This constitutional principle was expressly reaffirmed by the Court in Casey, 505 U.S. at 846, 879, 112 S.Ct. 2791, and reinforced in Carhart, 530 U.S. at 921, 120 S.Ct. 2597.
*629 We acknowledge, as did the Supreme Court in Casey, that “[m]en and women of good conscience can disagree, and we suppose some always shall disagree, about the profound moral and spiritual implications of terminating a pregnancy.” 505 U.S. at 850, 112 S.Ct. 2791. But even if “abortion [is] offensive to our most basic principles of morality ... that cannot control our decision,” for our obligation is to apply the Supreme Court’s definition of personal liberty, “not to mandate our own moral code.” Id. Thus, we are bound today to apply Carhart’s constitutional rule that any ban on “partial birth abortion” must include an exception to protect a woman’s health. We have been forewarned by the Court that “[s]ome cost will be paid by anyone who approves or implements a constitutional decision where it is unpopular, or who refuses to work to undermine the decision or to force its reversal. The price may be criticism or ostracism, or it may be violence.” Id. at 867, 112 S.Ct. 2791. The Court further warned that “[a]n extra price will be paid by those who themselves disapprove of the decision’s results when viewed outside of constitutional terms, but who nevertheless struggle to accept it, because they respect the rule of law.” Id. at 867-68, 112 S.Ct. 2791. These words have special resonance in today’s climate, and they serve to remind us of the critical importance of our obligation to follow faithfully the decisions of the Supreme Court.
V.
Because the Virginia Act does not contain an exception for circumstances when the banned abortion procedures are necessary to preserve a woman’s health, we affirm the summary judgment order declaring the Act unconstitutional on its face. We likewise affirm the permanent injunction against enforcement of the Act.[2]

AFFIRMED

. The plaintiffs nevertheless presented medical authority in the summary judgment record that is strikingly similar to that considered by the Supreme Court in Carhart. For example, both Dr. Fitzhugh and Dr. Charles deProsse (the plaintiffs’ expert) testified, based on their own lengthy experience in obstetrics and gynecology and on other medical sources, that the intact D & E/D & X abortion procedures prohibited by the Act are the safest and most medically appropriate for some women. Even Dr. Harlan Giles, a defense expert, testified that (1) the intact D & E/D & X as described in Dr. Fitzhugh’s declaration represents a "safe and medically appropriate” procedure; and (2) physicians should be allowed the flexibility to perform the intact D & E/D & X procedure if they think to do otherwise "would endanger the woman’s health." l.A. 483, 522.
In addition, an amicus brief was submitted to this court on behalf of a large group of physicians (over 3,400), including Physicians for Reproductive Choice and Health (PRCH), who have expertise in the field of reproductive health care and abortion procedures. These amici agree that the intact D & E/D & X procedure is an accepted medical procedure that is often the safest available. Br. of Amici Curiae PRCH et al. at 9, 12-23. They base their medical opinions on their own clinical experience and professional training, and they cite a variety of medical sources as further support. See, e.g., Stephen T. Chasen et al., Dilation and Evacuation at 's. 20 Weeks: Comparison of Operative Techniques, 190 Am. J. Ob. & Gyn. 1180, 1183 (2004) (finding that intact D & E/D & X and D & E by disarticulation are both safe procedures and recommending that physicians be allowed to decide which procedure is best for any given patient based on “intraoperative factors”); David A. Grimes; The Continuing Need for Late Abortions, 280 JAMA 747, 748 (1998) (explaining that intact D & E/D & X "may be especially useful in the presence of fetal anomalies, such as hydrocephalus,” because calvarium reduction allows "a smaller diameter to pass through the cervix, thus reducing risk of cervical injury,” while also allowing the physician to retain greater surgical control); Maureen Paul, et al., A Clinician’s Guide To Medical And Surgical Abortion 133-35 (1999) (noting that physicians often must compress or collapse the fetal calvari-um to facilitate removal through the cervix).
In contrast, the Commonwealth proffered in the summary judgment proceedings the testimony of two expert (physician) witnesses who offered the opinion that no maternal health exception is necessary here. In addition, the Commonwealth proffered supporting materials from the Congressional Record that included the committee testimony of an OB/ GYN professor. The district court excluded all of one expert’s testimony and selected portions of the other's, concluding that it was unreliable and inadmissible under Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), and Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). See Hicks, 301 F.Supp.2d at 511-12. The materials from the Congressional Record were excluded as inadmissible hearsay. See id. at 512. Even if we assumed without deciding that the district court abused its discretion' in excluding the Commonwealth's opinion evidence, the consideration of that evidence would not change our-result. The Commonwealth’s evidence would at most indicate some division of medical opinion on the question of whether “banning [the intact D & E/D & X] procedure could endanger women’s health.” Carhart, 530 U.S. at 938, 120 S.Ct. 2597. As the Court emphasized in Carhart, "unanimity of medical opinion” is not required because a
division of medical opinion ... at most means uncertainty, a factor that signals the presence -of risk, not its absence.... Where a significant body of medical opinion believes a procedure may bring with it greater *626 safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself proves the contrary. Rather, the uncertainty means a significant likelihood that those who believe that [intact D & E/|D & X is a safer abortion method in certain circumstances may turn out to be right. If so, then the absence of a health exception will place women at an unnecessary risk of tragic health consequences. If they are wrong, the exception will simply turn out to have been unnecessary.
Id. at 937, 120 S.Ct. 2597.

. Because the Act is invalid for its lack of a health exception, we decline to address the district court’s alternative grounds for striking it down. For this same reason, it is unnecessary for us to consider the Commonwealth’s other arguments.